THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* DOBBS FERRY MEDICAL PAVILLION, INC., Defendant, and JERRY ZUCKER, Appellant.  DONALD M. PEARLMAN et al., Nonparty Appellants.

Second Department, January 22, 1973.

*London, Buttenwieser & Chalif* (*Ephraim London* and *Franklin S. Bonem* of counsel), for appellants.

*Louis J. Lefkowitz, Attorney-General (Joel H. Sachs, Samuel A. Hirshowitz* and *Philip Weinberg* of counsel), for respondent.

*Per Curiam.* This is an appeal by defendant Zucker from a judgment which enjoined him and his codefendant, Dobbs Ferry Medical Pavillion, Inc., from operating an abortion facility at certain specified premises in Dobbs Ferry until the facility shall have been approved (i.e., licensed) as a hospital by the Public Health Council of the State of New York. Doctors Pearlman, Dorsen and Quint, partners whose offices constitute the alleged abortion facility, were not joined as defendants in this action, but have nevertheless joined in Zucker's appeal from the judgment on the ground that they are aggrieved by it because its injunctive scope specifically extends to all persons having knowledge of the injunction.

Before going to the merits of this appeal, we note that the doctors have standing to appeal because the judgment adversely affects them by barring them from performing abortions at their offices in the subject premises (see *Hobart* v. *Hobart,* 86 N. Y. 636; *Gats* v. *Gats,* 275 App. Div. 771; *Ryder* v. *Cue Car Rental,* 32 A D 2d 143; 10 Carmody-Wait 2d, New York Practice, § 70:69; cf. *Soto* v. *Lenscraft Optical Corp.,* 7 N Y 2d 747; *Posen* v. *Cowdin,* 267 App. Div. 158; *Petrie* v. *Chase Manhattan Bank,* 31 N Y 2d 856 [dec. Dec. 6, 1972]). We also note that the record shows, and the People conceded at the trial, that the three doctors are well qualified to perform abortion procedures and that their offices are adequately equipped for those procedures.

Abortions were legalized in New York State in 1970 (Penal Law, § 125.05 [L. 1970, ch. 127]) and outside New York City they may be performed in doctors' offices (*Robin* v. *Incorporated Vil. of Hempstead,* 30 N Y 2d 347). Within a year after the legalization of abortions, the three doctors here involved formed a partnership and leased a floor in a professional building at the subject premises, together with furniture and equipment, for the practice of obstetrics, gynecology and general surgery, and they hired defendant Zucker as business manager or administrator of their partnership practice. Since that time, more than three fourths of their extensive practice at these premises (their only offices for the practice of medicine) has been the performance of abortions; and most of the patients obtaining abortions have come from other States, perhaps because abortions were not legal in their States of residence.

Shortly after these doctors commenced practice at the subject premises, an official of the State Health Department visited their offices, concluded that the offices constituted a hospital facility

within the ambit of article 28 of the Public Health Law, and asked the doctors to file an application for approval (i.e., licensing) of their establishment by the Public Health Council. When they refused to file such application, this action for an injunction was brought by the Attorney-General.

Throughout the trial of this action, the appellants contended, inter alia, that their offices did not constitute a hospital but rather a suite of offices for the practice of group medicine, and that, moreover, the hospital licensing statute (Public Health Law, §§ 2801, 2801-a) and related provisions in the regulations of the Department of Health (10 NYCRR 700.2) were so vague and sweeping that they were unconstitutional. In response, the People urged that the licensing statute and related regulations were constitutional and that the appellants' offices constituted a hospital within their ambit; and they in effect conceded that ordinary group practice was not subject to the licensing provisions of the statute. After a plenary trial, the Trial Justice overruled the appellants' contentions and enjoined them from conducting an abortion facility at the subject premises until they were approved, as a hospital, by the Public Health Council. We believe that determination was erroneous and should be reversed, and that the complaint should be dismissed.

Subdivision 1 of section 2801-a of the Public Health Law provides that "no hospital, as defined in this article, shall be established except with the written approval of the public health council." Subdivision 1 of section 2801 defines "hospital" in these sweeping terms: "'Hospital' means a facility or institution engaged principally in providing services by or under the supervision of a physician * * * for the prevention, diagnosis or treatment of human disease, pain, injury, deformity or physical condition".

Subdivision 4 of section 225 of the Public Health Law empowers the Public Health Council to adopt rules and regulations (i.e., the Sanitary Code) and section 229 gives the Sanitary Code the effect of law. Pursuant to that power the council adopted section 700.2 of the Sanitary Code (10 NYCRR 700.2), which defines various medical facilities; among those therein defined (in subd. [a], par. 6) is an "independent out-of-hospital health facility", which is defined as follows: "an institution with one or more health clinics not part of an inpatient hospital facility * * * which is primarily engaged in providing services and facilities to out-of-hospital or ambulatory patients by or under the supervision of a physician". It is this last category (independent out-of-hospital health facility) which, accord-

ing to the People, encompasses the appellants' offices; and, say the People, such facilities are " hospitals " within the ambit of section 2801 of the Public Health Law. As hereinbefore noted, the appellants urge that the quoted statute and rule are unconstitutional for vagueness and that, in any event, their offices are not within the statute's scope. We think the appellants are right.

The right to practice a profession free of unreasonable governmental interference is protected by the Constitution of the United States (*Greene* v. *McElroy,* 360 U. S. 474, 492). A law " sweeping in a great variety of conduct under a general and indefinite characterization " cannot be sustained under the Due Process Clause (*Cantwell* v. *Connecticut,* 310 U. S. 296, 308) and a law " forbidding or requiring conduct in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates due process of law " (*Baggett* v. *Bullitt,* 377 U. S. 360, 367; see, also, *Keyishian* v. *Board of Regents,* 385 U. S. 589; *Cramp* v. *Board of Public Instruction,* 368 U. S. 278; *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495).* The constitutional rules as to vague statutes have been held to apply in civil, as well as criminal, proceedings (see *Burstyn, Keyishian, Baggett, Cramp, supra*).

In our case, the dispute centers largely on the word " clinic " in the Sanitary Code definition of an " independent out-of-hospital health facility ", on the vagueness of the statutory definition of a " hospital ", and on the lack of guidelines in either the statute or the Sanitary Code as to what facilities come within their ambit.

With respect to the word " clinic ", none of the People's witnesses attempted to define it, and the People apparently rest on an assumption that everyone, and especially doctors, know what it is, and that it is something quite different from the group practice of medicine. But dictionary definitions and the record in this case indicate the contrary. Thus, Stedman's Medical Dictionary defines " clinic " as " an institution, building, or part of a building where ambulatory patients are cared for "; and this definition could, of course, encompass the offices of a group practice or even the office of a single practitioner. Webster's Third New International Dictionary (1964 ed.) includes the following among its definitions of " clinic ": " 3a: an institution connected with a hospital or medical school where diagnosis and treatment are made available to outpatients b: a form of group

---

* *Burstyn* involved the pre-censorship and licensing of films, with the censor empowered to bar "sacrilegious" films. The court held that the word "sacrilegious" was imprecise, and that it was impermissible to have an administrative official decide, without guidelines, what films were "sacrilegious".

practice in which several physicians (as specialists) work in cooperative association''; hence, according to Webster's, a '' clinic '' can be either the outpatient department of a hospital *or* an ordinary group practice. The filed papers in this case include a recent article in a medical journal (*Medical World News,* March 17, 1972, p. 94) by Dr. Morris Fishbein, the former president of the American Medical Association; the article is titled '' On Private Group Clinics '' but its subject is '' group practice ''—what it is, and why and how it is growing rapidly. A defense witness, expert in the field of group practice, testified that the word '' clinic '' is ambiguous and practically indefinable and that its meaning varies, depending upon the time, place, context and person using the word; and that the Mayo Clinic and Leahy Clinic, for example, were actually private group practices, despite the word '' clinic '' in their names.

From the foregoing, it seems evident that the word '' clinic '' is unclear and often interchangeable with '' group practice '', and any purported distinction between the two is either blurred or even nonexistent. Neither the statute nor the Sanitary Code contains any definition of a '' clinic ''. The State Health Department officials who testified for the People in this case conceded that neither the statute nor the code contains any criteria to guide them in determining whether any particular facility or office was or was not a '' clinic ''; that the only guidelines for those determinations were contained in unpublished, written or oral directions of the Health Department administrators to their staff; and that those directions and criteria could be changed at the whim of the administrators.

An '' independent out-of-hospital health facility '' is defined in the Sanitary Code as an '' institution '' with one or more '' health clinics '' (10 NYCRR 700.2 [a] [6]), and the People seek to bring the subject premises within the hospital licensing provisions of the Public Health Law by contending that they are an institution with a '' clinic'' and therefore a '' hospital ''. In our opinion, the vagueness and ambiguity of the word '' clinic '' are fatal flaws in the statute and the code. And these flaws are compounded by the fact that, as applied by the State Health Department, the sweep of the statute and the code is determined by the changeable, unpublished directives of the changeable administrations of the Health Department.

In view of all the foregoing, we conclude that section 2801 of the Public Health Law and section 700.2 of the Sanitary Code (10 NYCRR 700.2), when considered together, are unconstitutional as written and as applied in this case.

Apart from the foregoing, we believe the record in this case establishes that the appellants doctors were merely a partnership engaged in a specialized group practice and that their offices do not constitute an "independent out-of-hospital health facility" within the ambit of section 700.2 of the Sanitary Code.

The American Medical Association has defined "group practice" as "the application of medical services by three or more full-time physicians formally organized to provide medical care, consultation, diagnosis, and/or treatment through the joint use of equipment and personnel, with the income from medical practice distributed in accordance with methods previously determined by the group" (*Medical World News,* March 17, 1972, p. 94, *supra*).

The record in this case establishes that the practice of the appellants doctors comes squarely within that definition. They are a partnership; they jointly use their offices and equipment, for which they jointly pay rent; bills payable and receivable are in their joint names; all fees are paid to the partnership and the partners share the income and expenses equally, as provided in their partnership agreement; their business administrator is paid a fixed salary and does not share in their fees; the corporation from which they lease the offices and equipment gets a fixed annual rental therefor and does not share in their fees; and neither their business administrator nor their lessor has any financial interest in the doctors' practice, apart from their salary and rental. As the defendants' expert on group practice testified, this pattern of operation is typically that of a group practice and not that of an institution or hospital; and we agree with that appraisal of it.

The learned trial court apparently believed that the appellants were operating an institution because of the volume of their business, the size of their income, the preponderance of abortions in their practice, their regular working hours, a seeming lack of personal contact between patient and doctor, and various other factors. We disagree with the trial court as to his interpretation of the record and the relevance of these facts to the issue of whether this was or was not a group practice. In our opinion, the volume of business and resultant large income in no way convert these doctors' offices from a lucrative group practice to an "institution"; nor is it relevant that their practice consists largely of abortions, since that is now as legal a specialty as radiology or surgery; equally irrelevant are the regular hours they work, as most specialists, and particularly those in group practice, now work regular hours. With respect to

patient-doctor contacts, we find in this record no less personal contact than is now customary in many offices of busy specialists. As for the other factors referred to in the trial court's decision, we either interpret them differently or find them irrelevant on the issue here involved.

The People rely heavily on *State of New York* v. *Mitchell* (66 Misc 2d 514) and *State of New York* v. *Abortion Information Agency* (37 A D 2d 142, affd. 30 N Y 2d 779). Both cases are clearly distinguishable on their facts, as they involved commercial referral enterprises, owned and operated by laymen, which sold medical services and received part of the doctors' fees; none of those facts exist in the case at bar.

Finally, it should be noted that there is no merit in the People's contention that if a hospital license is not required for the subject premises, they will constitute a dangerous abortion clinic which the Health Department will never be able to investigate, supervise and regulate. Apart from the fact that the safety record of the appellants' operations appears to be far better than average, they are subject to adequate supervision and control under other provisions of law. As doctors, they are licensed by the State Department of Education and can be investigated and delicensed if they practice unethically. The Health Commissioner has statutory power to enter and inspect any buildings and places (Public Health Law, § 206, subd. 2); and he may investigate any person who is doing something which endangers health, may hold hearings, and may then take whatever remedial actions he deems appropriate in the circumstances (Public Health Law, §§ 12-a, 16). Clearly, then, the State has power to protect the people from any unsafe abortion facility, even if it is not licensed as a " hospital ".

We conclude that the judgment should be reversed, on the law and the facts, with one bill of costs jointly to the nonparty appellants against the respondent, and that the complaint should be dismissed.

MUNDER, J. (dissenting). The State Health Department has concluded that the building at which the three doctors involved in the case have been performing abortions constitutes a hospital facility under article 28 of the Public Health Law, and has asked them to apply for a license. They refused and this lawsuit resulted. A trial was held, the trier of the facts agreed with the Health Department, and a judgment was entered enjoining abortion activity at the building (which was commonly known as the Dobbs Ferry Medical Pavillion) until a license would be procured. The majority would now reverse the judgment pri-

marily on the ground that the statute (Public Health Law, § 2801) and the regulations (10 NYCRR 700.2) pursuant to which the Health Department acted are unconstitutional because of vagueness. I disagree and I vote to affirm.

I agree with my colleague, Mr. Justice HOPKINS, who said in his dissenting memorandum in *People* v. *Hatchamovitch* (40 A D 2d 556, 557): " As I read the statute, I do not find its provisions void for vagueness. First, the legislation defines a hospital as ' a facility or institution engaged principally in providing services by or under the supervision of a physician * * * for the * * * treatment of * * * physical condition including, but not limited to, a general hospital * * * treatment center * * * maternity hospital * * * outpatient department, dispensary and a laboratory or central service facility serving one or more such institutions ' (Public Health Law, § 2801, subd. 1). This broad definition is narrowed by the State Hospital Code (Public Health Law, § 2803), which includes as medical facilities both a hospital — said to mean an institution with beds for one or more in-patients, not related to the operator, primarily engaged in providing services under the supervision of a physician (10 NYCRR 700.2 [a] [5] [State Hospital Code]) — and an independent out-of-hospital health facility, meaning an institution with one or more health clinics, not part of an in-patient hospital facility, primarily engaged in providing services and facilities to out-of-hospital or ambulatory patients (under the supervision of a physician) (10 NYCRR 700.2 [a] [6]). It is the latter category under which, in my view, defendants' operations fall."

At bar, specifically, the Health Department found the doctors were performing abortions at an " independent out-of-hospital health facility ". The doctors contend they are conducting what is referred to as a " group practice " and the abortions are being performed at their offices. As observed by Mr. Justice HOPKINS in *Hatchamovitch* (*supra*, p. 559), " As physicians they are more than laymen and presumably fully aware of the usages which are engrafted on words of art employed in the practice of medicine. Clinic, hospital, and health facility cannot be words without special meaning to them as professional men."

I have no difficulty in distinguishing between an " independent out-of-hospital health facility " and an office used by a doctor or a group of doctors. The key element is that the former, as its definition states, is an institution. When someone goes to a *place* for treatment rather than to a specific doctor, we are dealing with an institution and not the traditional private practice.

of medicine. An institutional operation is bound to involve a greater volume of medical business than the practice of an ordinary private practitioner; and, since the patient has no prior familiarity with the doctor or any ongoing relationship with him, the State has a special interest in seeing that acceptable facilities and care are provided.

The overwhelming evidence before us shows that the doctors were working at an institution. They performed about 10,000 abortions a year. Of the 3,250 fetal death certificates filed during the first four months of 1972, approximately 90% showed the " patients " to be from out of the State. When someone called the Pavillion to obtain information about an abortion, they were told it would be performed by one of the Pavillion's doctors — no specific name was mentioned. The Pavillion made airplane schedules and limousine service available. The patients were encouraged to prepay their bill and to make their checks payable to " cash ". The doctor who performed the abortion saw the patient for the first time only minutes before the surgery and the patient was told to consult her own doctor in case any complications subsequently arose. There is no doubt in my mind that most, if not all, of the women who went to the Dobbs Ferry Pavillion went to have an abortion, not to see a particular doctor (see State of New York v. Mitchell, 66 Misc 2d 514, 519–521).

The majority concludes that there is no rational basis upon which section 2801 of the Public Health Law can stand. In this I think it is disregarding the expertise of the administrative agency entrusted with interpreting that statute. The recent case of Matter of Howard v. Wyman (28 N Y 2d 434, 438) contains the following admonition by Chief Judge FULD on this subject: " It is well settled that the construction given statutes and regulations by the agency responsible for their administration, if not irrational or unreasonable, should be upheld. * * * As this court wrote in the Mounting & Finishing Co. case (294 N. Y., at p. 108), ' statutory construction is the function of the courts " but where the question is one of specific application of a broad statutory term in a proceeding in which the agency administering the statute must determine it initially, the reviewing court's function is limited " (Board v. Hearst Publications, 322 U. S. 111, 131). The administrative determination is to be accepted by the courts " if it has ' warrant in the record ' and a reasonable basis in law " (same citation). " The judicial function is exhausted when there is found to be a rational basis for

the conclusions approved by the administrative body" (*Rochester Tel. Corp.* v. *U. S.*, 307 U. S. 125, 146).'"

I find there is a rational basis for the Health Department's position in this case. As Mr. Justice HOPKINS observed in *People* v. *Hatchamovitch* (40 A D 2d 556, 557, *supra*): " Birth and pregnancy have always been proper concerns of the State (e.g., Public Health Law, § 2500 [maternal health and maternal hospitals], § 2560 [practice of midwifery], § 2730 [birth defects]). The recent legalization of abortions (Penal Law, § 125.05) places a further responsibility on the Commissioner of Health which he must discharge to protect the community". To this end, the State Hospital Code states that " an abortional act may be performed in an independent out-of-hospital health facility only up to and including the 12th week of pregnancy. Thereafter, it shall be performed on an inpatient basis only " (10 NYCRR 751.9[b]). The State Medical Society's guidelines caution " physicians that an abortion performed after the twelfth week of gestation is fraught with tremendous danger." Also, the society has recommended that abortions be performed only in a State-certified hospital or in a suitably equipped and staffed facility administered by or affiliated with such a hospital. In New York City the Board of Health has outlawed the performance of abortions in doctors' offices (see, generally, New York City Health Code, tit. III, art. 42). There is testimony in the record at bar from a Deputy Commissioner of the State Health Department that the department's guidelines, which were developed concurrently with a committee of the State's Medical Society, recommend that abortions be performed only in hospitals.

Based upon the foregoing, I think the license requirements which the Department of Health seeks to enforce are reasonable. If the defendants' facilities are as modern and safe as they claim, they should have no difficulty in complying therewith. If a license is withheld arbitrarily, judicial review is available.

I vote to affirm.

RABIN, P. J., LATHAM, SHAPIRO and CHRIST, JJ., concur in *Per Curiam* opinion; MUNDER, J., dissents and votes to affirm the judgment, with an opinion.

Judgment reversed, on the law and the facts, with one bill of costs jointly to the nonparty appellants against respondent, and complaint dismissed.