Norman A. Stiller, J.
This is an action for a permanent injunction pursuant to section 2801-b of the New York State Public Health Law, seeking to prevent the defendants from opening and operating an alleged clinic or “out-of-hospital health facility” (so called) in offices on the second floor of an office building on Pine Street in the City of Niagara Falls, for the performance of recently legalized abortions unless and until the certificate of the Public Health Council is first obtained pursuant to sections 2801-a and 2805 of said law. The defendants contend that such approval is not necessary since it is proposed to operate doctors’ offices and not a clinic or out-of-hospital health facility, and also that the said statute and the code enacted thereon are too vague and indefinite to be enforceable, and that the code exceeds its statutory authority. It is conceded by all that abortions may be conducted in doctors’ offices without being subject to such certificate.
Originally the only defendants named were Martin Mitchell and Mitchell Referral Services, Inc., who were served with the summons and complaint herein together with a notice of motion accompanied by supporting papers seeking an injunction pendente lite. On the return date, December 23,1970, the parties appeared and offered proof by witnesses in open court. Plaintiff then moved for adjournment until January 19, 1971 and for permission to bring in as necessary parties defendants, Dr. Norman Sage and M. S. M., Inc., and said motions were granted. Shortly after the return day the parties filed with this court a stipulation in writing signed by all four defendants and the plaintiff, to the effect that all consented to adding the two said defendants and that all agreed that the hearing held as aforesaid on December 23,1970 on application for a temporary injunction shall be deemed a trial on the merits for a permanent injunction and that the court may determine the merits of the action on the evidence thus previously presented.
*516 This evidence consists of the testimony of two witnesses: Dr. La Verne E. Campbell, the Eegional Health Director of the New York State Department of Health, who testified on behalf of the plaintiff, and Martin Mitchell, who testified on behalf of the defendants. From the pleadings and the papers submitted and from the testimony of said witnesses and exhibits, this court finds as follows:
That on or about September 15, 1970 the defendant, Mitchell, called upon the said Dr. Campbell to advise him of his plans to obtain offices in Niagara Falls, N. Y., within which six physicians would perform abortions, and that an arrangement would be sought with the Niagara Falls Memorial Medical Center to handle whatever emergency cases might arise. Thereafter, because of newspaper articles which indicated a volume operation including the leasing of airplanes to transport patients from the State of Michigan, etc., Dr. Campbell questioned the said Mr. Mitchell.
Mr. Mitchell admitted the accuracy of the newspaper stories and stated to Dr. Campbell that there would be about six doctors servicing the facility headed by Dr. Sage and that a telephone referral service had already been established in Niagara Falls and that two leased or chartered planes carrying 60 patients daily would deliver patients to the facility and return them to Michigan the same day. That Mr. Mitchell seemed to be in charge of the enterprise, even to the extent of meeting with the president of the Niagara Falls Medical Center to make arrangements for emergency service to the patients of the facility. That further, the facility would be known under the title Center Clinic to be assumed by Dr. Sage. Upon this basis Dr. Campbell ruled on behalf of the department that this was to be no doctors’ office but instead would be an out-of-hospital health facility which required the approval of the Public Health Council before opening.
According to Mr. Mitchell’s testimony, he is a resident of Michigan and has no professional medical training. He is a businessman and as such he felt that the legalizing of abortions in New York State would afford him an opportunity to enter into a new business acting as a referral service for women in Michigan, where abortions are illegal, to obtain legal abortions in New York State.
In furtherance of his plan he came to New York State to make contacts with doctors and hospitals. Having some difficulty in this regard, he decided to find a site where such services could be rendered and he came to the conclusion that Niagara *517 Falls was a good place for that purpose, in that it had an airport so that persons could be transported rapidly back and forth on the same day, and furthermore that it was a small place and less confusing to strangers and was centrally located to Detroit, Toronto, Cleveland, etc. He then contacted doctors in Niagara Falls to make arrangements for abortions, but when they would not agree, he went to the New York State officials to see what was necessary to enter into such a service and at the same time he approached his friend, Dr. Norman Sage, a physician licensed in Michigan to interest him in opening an office in New York State for the purpose of performing legal abortions. Dr. Sage agreed, providing that he could obtain approval to practice in New York State and providing that a suitable location could be found. Mr. Mitchell then interviewed the Health Department and arranged for Dr. Sage and another doctor to come to New York State to be interviewed by the Health Department, and on or about October 1,1970 Mr. Mitchell formed two New York corporations, in each of which he was president and sole stockholder. One of these corporations he named the Mitchell Clinical Properties, Inc. but apparently the name required changing to M. S. M. Properties, Inc.; the other is Mitchell Referral Services, Inc.
On October 1,1970 as president and sole stockholder of M.S.M. Properties, Inc., Mr. Mitchell entered into- a lease for 3,000 square feet of office space' consisting of a suite of eight offices, a waiting room, a lounge and separate lavatories for men and women, all located on the second floor of the Oarson Building on Pine Avenue in the City of Niagara Falls. The said lease is for a period of two years from the date thereof at a rental of $675 per month. Thereupon M. S. M. Properties, Inc. furnished the said offices completely as doctors’ offices with three operating rooms and two recovery rooms as contained in appendix F attached to the moving papers, as weE as a general business office (referred to in said exhibit as “ secretarial office ”) in the most prominent place off the waiting room, close to the entrance of said suite.
On October 19 he sublet the so-called secretarial office to his other corporation, the Mitchell Referral Service, Inc., on a month-to-month basis at $1,000 per month, and thereafter and in October, 1970 he commenced advertising to the effect that he was opening a referral service and gave interviews to the newspapers showing photos of himself and his mother decorating the various rooms including the recovery rooms. He advertised in newspapers, offering a flat rate proposal to transport *518 pregnant women from Michigan to New York State and back on the same day by plane for $400, or if they wish to furnish their own transportation or lived in or near Niagara Falls the fee would be $300. Mr. Mitchell also solicited doctors in Michigan and elsewhere by letter, informing them of the availability of facilities for abortions in New York State, stating that up to the 12th week of pregnancy the procedure may be performed in an “ out-patient facility” for a fee of $300 and thereafter and through the 24th week such abortions must be performed in an “ in-patient facility ”, in which event the fee would vary, depending upon the length of pregnancy and in said letter informing the doctors that private air and ground transportion at reasonable cost is available. Everyone interested was advised to contact the Mitchell Referral Service, Inc. at a Niagara Falls post-office box or at the telephone installed in the office of Mitchell Referral Service, Inc. in the suite of offices mentioned heretofore, and particularly in the office marked “ secretarial ” on said appendix F.
At that time Dr. Sage apparently did not have approval to practice in New York State, but on or about December 1, 1970 Dr. Sage, having been approved as a physician in New York State, entered into a sublease with M. S. M., Inc. for the remainder of the Carson Building suite, then completely furnished as doctors’ offices, on a month-to-month basis at a rental of $2,000 per month. Although it is contended by Mr. Mitchell that the Mitchell Referral Service would treat Dr. Sage, like any other doctor and refer patients to him along with six other doctors or facilities elsewhere in New York State, this court is convinced that, by the proof submitted and the stake which Mr. Mitchell has in the Niagara Falls facility, the rental, the furniture and equipment, and lucrative subleases, that the Niagara Falls facility is going to be run pretty much in the manner as stated in the newspaper exhibits in evidence, and that Dr. Norman Sage will be only one of the doctors in said establishment and will be subject to the will of Mr. Mitchell in that all the facilities are owned by Mr. Mitchell’s corporations and Dr. Sage would have only a one-month lease and could be replaced readily.
According to Mr. Mitchell’s further testimony, his office in the suite in question is his principal and only office and it can readily be seen that the office is so located that when patients arrive the personnel of the referral service would be first and the only person to greet them. Mr. Mitchell explained that when an applicant calls the referral service, she is instructed *519 to send the full amount of money to the referral service, together with a doctor’s certificate of her health and pregnancy, giving all necessary details thereof, and she is then told that an appointment will be made. If it is past the 12-week period, the fee is $750, which is all-inclusive, regardless of how long it is necessary for her to remain in the hospital. From this money, the service pays the doctor, the hospital and any other expenses, and keeps the rest. In a simple abortion at $400, the service takes $100 for transportation and of the $300 remaining, the service pays the doctor. If the doctor performs for $250, the referral service keeps the balance of $50; and if the doctor’s fee is $200, then the referral service keeps $100. This is clearly fee splitting.
With Mr. Mitchell in control of the lease, the furniture, the patients and the establishment, it is not difficult to understand that Dr. Sage’s bill for services to be paid by Mitchell Referral Service must be satisfactory to the Mitchell Referral Service if the doctor is to remain, and it is likewise easy to see that with 60 patients per day coming into the establishment by plane or otherwise, intending to leave that very same day for substantial distances from the facility, that this facility is not to be conducted as an ordinary doctor’s office. The doctor-patient relationship is nonexistent. Patients are merely being brought or solicited to come to a place where abortions are performed instead of coming to see a particular doctor. The open solicitation of patients makes this facility one which will require the handling of many more people than are treated by doctors ordinarily. The patient is merely dealing with the Mitchell Referral Service and will go to the particular facility regardless of who the doctor might be. The doctor would be unknown to them until they had been introduced by the referral service in the facility office and told who was to perform the abortion and the said doctor is even at the time unknown to them and they to him. He has made no previous examination or personal investigation as to the health of the patient, but depends solely upon the documents given to him by the referral service. There is no provision for after care or emergencies occurring on return to home. There are other reasons why this cannot be regarded as a doctor’s office, for it is inconceivable that a doctor’s office would contain within it an organization which solicits openly and advertises for patients and in effect is splitting fees with him for so doing, particularly in view of section 6514 (subd. 2, pars, [d] and [f]) of the Education Law, which prohibits doctors from soliciting, advertising or splitting fees.
*520 The question remaining is whether the proceeding brought is based on a law which is sufficient, valid, and controlling so as to afford the Public Health Service jurisdiction over such facility. Article 28 of the Public Health Law of the State of New York concerns itself with regulation of hospitals and related facilities, including health related facilities, and while the facility involved is not a hospital in the ordinary sense of the word, we must look to the definition of a hospital as contained in the statute.
Section 2801 of said article defines a hospital as follows: “ 1. ‘ Hospital ’ means a facility or institution engaged principally in providing services by or under the supervision of a physician or, in the case of a dental clinic or dental dispensary, of a dentist, for the prevention, diagnosis or treatment of human disease, pain, injury, deformity or physical condition including, but not limited to, a general hospital, public health center, diagnostic center, treatment center, dental clinic, dental dispensary, rehabilitation center other than a facility used solely for vocational rehabilitation, nursing home, tuberculosis hospital, chronic disease hospital, maternity hospital, lying-in-asylum, out-patient department, dispensary and a laboratory or central service facility serving one or more such institutions, but the term hospital shall not include an institution, sanitarium or other facility engaged principally in providing services for the prevention, diagnosis or treatment of mental disability and which is subject to the powers of visitation, examination, inspection and investigation of the department of mental hygiene except for those distinct parts of such a facility which provide hospital service. ” (Emphasis supplied.)
Section 2803 provides for a Commissioner to inquire into the operation of hospitals, to conduct periodic inspections thereof, provide rules and by-laws, standards of medical care including health related services, etc., and in accordance with said section a State Hospital Code was enacted, covering hospitals and other health related facilities, among which is an independent out-of-hospital health facility, which is defined in 10 NYCRR 700.2 (a)(6) as follows: “ Independent out-of-hospital health facility shall mean an institution with one or more health clinics not part of an inpatient hospital facility or vocational rehabilitation center which is primarily engaged in providing services and facilities to out-of-hospital or ambulatory patients by or under the supervision of a physician, or in the case of a dental clinic or dispensary, of a dentist, for the prevention, diagnosis, or treatment of human disease, pain, injury, deformity or *521 physical condition, including but not limited to a diagnostic center, treatment center or dispensary. ” (Emphasis supplied.)
It is the contention of the defendants that there is no coherence between the legislative enactment and the code insofar as it originates the name and category of ‘ ‘ out-of-hospital health facility ” and therefore such was beyond and outside the authority vested by such section.
This court finds that there is coherence between the code and the statute, in that a hospital is defined as a facility or institution engaged principally in providing services by or under the supervision of a physician, that it is not limited to a general hospital and includes a treatment center. Under this wording it would seem that the category or definition of ‘ ‘ independent out-of-hospital health facility ’ ’ as contained in the code is properly founded and refers to an institution with one or more health clinics. A doctor or group of doctors practicing in their own joint offices, each engaged in rendering professional medical services need not be concerned with being considered an institution; but when such doctor or doctors join with an organization such as the referral service herein described, then the doctor has become part of an institution to which people go for medical care instead of going to a particular doctor.
This court finds that Mr. Mitchell has every intent to become and operate as an institution within the meaning of the definition of an independent out-of-hospital health facility and proposes to conduct a medical clinic which is subject to the law and regulations thereunder and must obtain the approval and certificate of the Public Health Council.
It is significant that Dr. Norman Sage, who is the person most affected and concerned as to his right to open a doctor’s office at the subject premises and is in a position to give the most authoritative testimony as to whether said office is to be so conducted, has not seen fit to testify either in person or by depositions, nor has he seen fit to file an affidavit in contradiction to the plaintiff’s motion but has rested his case upon the testimony already given, and the court does therefore conclude that Dr. Norman Sage’s testimony would not support or assist the defendants’ cause.
This court concludes that failure on the part of the defendants to obtain the approval and certificate of the Public Health Council may reasonably result in injury to persons treated in the subject facility.
The plaintiff is entitled to the relief demanded in the complaint.