# BIGELOW *v.* VIRGINIA

No. 73–1309.   Argued December 18, 1974—Decided June 16, 1975

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and DOUGLAS, BRENNAN, STEWART, MARSHALL, and POWELL, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which WHITE, J., joined, *post*, p. 829.

*Melvin L. Wulf* and *John C. Lowe* argued the cause for appellant. With them on the brief were *Joel M. Gora, Judith Mears,* and *F. Guthrie Gordon III.*

*D. Patrick Lacy, Jr.,* Assistant Attorney General of Virginia, argued the cause for appellee. With him on the brief were *Andrew P. Miller,* Attorney General,

*Anthony F. Troy,* Deputy Attorney General, and *Paul L. Gergoudis,* Assistant Attorney General.*

Mr. Justice Blackmun delivered the opinion of the Court.

An advertisement carried in appellant's newspaper led to his conviction for a violation of a Virginia statute that made it a misdemeanor, by the sale or circulation of any publication, to encourage or prompt the procuring of an abortion. The issue here is whether the editor-appellant's First Amendment rights were unconstitutionally abridged by the statute. The First Amendment, of course, is applicable to the States through the Fourteenth Amendment. *Schneider* v. *State,* 308 U. S. 147, 160 (1939).

## I

The Virginia Weekly was a newspaper published by the Virginia Weekly Associates of Charlottesville. It was issued in that city and circulated in Albemarle County, with particular focus on the campus of the University of Virginia. Appellant, Jeffrey C. Bigelow, was a director and the managing editor and responsible officer of the newspaper.[1]

On February 8, 1971, the Weekly's Vol. V, No. 6, was published and circulated under the direct re-

---

*Raymond T. Bonner* and *Alan B. Morrison* filed a brief for Public Citizen et al. as *amici curiae* urging reversal.

*Michael M. Kearney* filed a brief for Virginia Right to Life, Inc., as *amicus curiae* urging affirmance.

[1] His brief describes the publication as an "underground newspaper." Brief for Appellant 3. The appellee states that there is no evidence in the record to support that description. Brief for Appellee 3 n. 1.

sponsibility of the appellant.   On page 2 of that issue was the following advertisement:

"UNWANTED PREGNANCY
LET US HELP YOU
Abortions are now legal in New York.
There are no residency requirements.
FOR IMMEDIATE PLACEMENT IN ACCREDITED
HOSPITALS AND CLINICS AT LOW COST

Contact
WOMEN'S PAVILION
515 Madison Avenue
New York, N. Y. 10022
or call any time
(212) 371–6670 or (212) 371–6650
AVAILABLE 7 DAYS A WEEK
STRICTLY CONFIDENTIAL.   We will make
all arrangements for you and help you
with information and counseling."

It is to be observed that the advertisement announced that the Women's Pavilion of New York City would help women with unwanted pregnancies to obtain "immediate placement in accredited hospitals and clinics at low cost" and would "make all arrangements" on a "strictly confidential" basis; that it offered "information and counseling"; that it gave the organization's address and telephone numbers; and that it stated that abortions "are now legal in New York" and there "are no residency requirements."   Although the advertisement did not contain the name of any licensed physician, the "placement" to which it referred was to "accredited hospitals and clinics."

On May 13 Bigelow was charged with violating Va. Code Ann. § 18.1–63 (1960).   The statute at that time read:

"If any person, by publication, lecture, advertisement, or by the sale or circulation of any publication, or in any other manner, encourage or prompt

the procuring of abortion or miscarriage, he shall be guilty of a misdemeanor." [2]

Shortly after the statute was utilized in Bigelow's case, and apparently before it was ever used again, the Virginia Legislature amended it and changed its prior application and scope.[3]

Appellant was first tried and convicted in the County Court of Albemarle County. He appealed to the Circuit Court of that county where he was entitled to a *de novo* trial. Va. Code Ann. §§ 16.1–132 and 16.1–136 (1960). In the Circuit Court he waived a jury and in July 1971

---

[2] We were advised by the State at oral argument that the statute dated back to 1878, and that Bigelow's was the first prosecution under the statute "in modern times," and perhaps the only prosecution under it "at any time." Tr. of Oral Arg. 40. The statute appears to have its origin in Va. Acts of Assembly 1877–1878, p. 281, c. 2, § 8.

[3] The statute, as amended by Va. Acts of Assembly 1972, c. 725, now reads:

"18.1–63. If any person, by publication, lecture, advertisement, or by the sale or circulation of any publication, or through the use of a referral agency for profit, or in any other manner, encourage or promote the processing of an abortion or miscarriage to be performed in this State which is prohibited under this article, he shall be guilty of a misdemeanor."

It is to be observed that the amendment restricts the statute's application, with respect to advertising, to an abortion illegal in Virginia and to be performed there. Since the State's statutes purport to define those abortions that are legal when performed in the State, see Va. Code Ann. §§ 18.1–62.1 and 18.1–62.3 (Supp. 1975), the State at oral argument described the pre-1972 form of § 18.1–63 as "effectively repealed by amendment," and, citing *Roe* v. *Wade*, 410 U. S. 113 (1973), and *Doe* v. *Bolton*, 410 U. S. 179 (1973), the statute, as amended, as limited to an abortion performed by a nonphysician. Tr. of Oral Arg. 38–39. In any event, there is no dispute here that the amended statute would *not* reach appellant's advertisement.

was tried to the judge. The evidence consisted of stipu-
lated facts; an excerpt, containing the advertisement in
question, from the Weekly's issue of February 8, 1971;
and the June 1971 issue of Redbook magazine, containing
abortion information and distributed in Virginia and in
Albemarle County. App. 3, 8. The court rejected ap-
pellant's claim that the statute was unconstitutional and
adjudged him guilty. He was sentenced to pay a fine of
$500, with $350 thereof suspended "conditioned upon no
further violation" of the statute. *Id.,* at 5.

The Supreme Court of Virginia granted review and,
by a 4–2 vote, affirmed Bigelow's conviction. 213 Va.
191, 191 S. E. 2d 173 (1972). The court first rejected
the appellant's claim that the advertisement was purely
informational and thus was not within the "encourage or
prompt" language of the statute. It held, instead, that
the advertisement "clearly exceeded an informational
status" and "constituted an active offer to perform a serv-
ice, rather than a passive statement of fact." *Id.,* at 193,
191 S. E. 2d, at 174. It then rejected Bigelow's First
Amendment claim. This, the court said, was a "com-
mercial advertisement" and, as such, "may be constitu-
tionally prohibited by the state," particularly "where, as
here, the advertising relates to the medical-health field."
*Id.,* at 193–195, 191 S. E. 2d, at 174–176. The issue, in
the court's view, was whether the statute was a valid
exercise of the State's police power. It answered this
question in the affirmative, noting that the statute's goal
was "to ensure that pregnant women in Virginia who
decided to have abortions come to their decisions with-
out the commercial advertising pressure usually inci-
dental to the sale of a box of soap powder." *Id.,* at 196,
191 S. E. 2d, at 176. The court then turned to Bige-
low's claim of overbreadth. It held that because the

appellant himself lacked a legitimate First Amendment interest, inasmuch as his activity "was of a purely commercial nature," he had no "standing to rely upon the hypothetical rights of those in the non-commercial zone." *Id.*, at 198, 191 S. E. 2d, at 177–178.

Bigelow took a timely appeal to this Court. During the pendency of his appeal, *Roe* v. *Wade,* 410 U. S. 113 (1973), and *Doe* v. *Bolton,* 410 U. S. 179 (1973), were decided. We subsequently vacated Bigelow's judgment of conviction and remanded the case for further consideration in the light of *Roe* and *Doe.* 413 U. S. 909 (1973).[4]

The Supreme Court of Virginia, on such reconsideration, but without further oral argument, again affirmed appellant's conviction, observing that neither *Roe* nor *Doe* "mentioned the subject of abortion advertising" and finding nothing in those decisions "which in any way affects our earlier view."[5] 214 Va. 341, 342, 200 S. E. 2d 680 (1973). Once again, Bigelow appealed. We noted probable jurisdiction in order to review the important First Amendment issue presented. 418 U. S. 909 (1974).

II

This Court often has recognized that a defendant's standing to challenge a statute on First Amendment grounds as facially overbroad does not depend upon whether his own activity is shown to be constitutionally privileged. The Court consistently has permitted "attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own

---

[4] See Note, The First Amendment and Commercial Advertising: Bigelow v. Commonwealth, 60 Va. L. Rev. 154 (1974).

[5] Virginia asserts, rightfully we feel, that this is "a First Amendment case" and "not an abortion case." Brief for Appellee 15 n. 6; Tr. of Oral Arg. 26.

conduct could not be regulated by a statute drawn with the requisite narrow specificity." *Dombrowski* v. *Pfister,* 380 U. S. 479, 486 (1965). See also *Grayned* v. *City of Rockford,* 408 U. S. 104, 114 (1972); *Gooding* v. *Wilson,* 405 U. S. 518, 520–521 (1972); *Coates* v. *City of Cincinnati,* 402 U. S. 611, 616 (1971), and *id.,* at 619–620 (WHITE, J., dissenting); *NAACP* v. *Button,* 371 U. S. 415, 432 (1963); *Thornhill* v. *Alabama,* 310 U. S. 88, 97–98 (1940). The Supreme Court of Virginia itself recognized this principle when it recently stated that "persons who engage in non-privileged conduct are not precluded from attacking a statute under which they were convicted." *Owens* v. *Commonwealth,* 211 Va. 633, 638–639, 179 S. E. 2d 477, 481 (1971). "For in appraising a statute's inhibitory effect upon [First Amendment] rights, this Court has not hesitated to take into account possible applications of the statute in other factual contexts besides that at bar." *NAACP* v. *Button,* 371 U. S., at 432. See generally Note, The First Amendment Overbreadth Doctrine, 83 Harv. L. Rev. 844, 847–848 (1970).

This "exception to the usual rules governing standing," *Dombrowski* v. *Pfister,* 380 U. S., at 486, reflects the transcendent value to all society of constitutionally protected expression. We give a defendant standing to challenge a statute on grounds that it is facially overbroad, regardless of whether his own conduct could be regulated by a more narrowly drawn statute, because of the "danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." *NAACP* v. *Button,* 371 U. S., at 433.

Of course, in order to have standing, an individual must present more than "[a]llegations of a subjective 'chill.'" There must be a "claim of specific present ob-

jective harm or a threat of specific future harm." *Laird v. Tatum,* 408 U. S. 1, 13–14 (1972). That requirement, however, surely is met under the circumstances of this case, where the threat of prosecution already has blossomed into the reality of a conviction, and where there can be no doubt concerning the appellant's personal stake in the outcome of the controversy. See *Baker* v. *Carr,* 369 U. S. 186, 204 (1962). The injury of which appellant complains is one to him as an editor and publisher of a newspaper; he is not seeking to raise the hypothetical rights of others. See *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163, 166 (1972); *Breard* v. *Alexandria,* 341 U. S. 622, 641 (1951). Indeed, unlike some cases in which the standing issue similarly has been raised, the facts of this case well illustrate "the statute's potential for sweeping and improper applications." *Gooding* v. *Wilson,* 405 U. S., at 532–533 (BURGER, C. J., dissenting).

Declaring a statute facially unconstitutional because of overbreadth "is, manifestly, strong medicine," and "has been employed by the Court sparingly and only as a last resort." *Broadrick* v. *Oklahoma,* 413 U. S. 601, 613 (1973). But we conclude that the Virginia courts erred in denying Bigelow standing to make this claim, where "pure speech" rather than conduct was involved, without any consideration of whether the alleged overbreadth was or was not substantial. *Id.,* at 615, 616. The Supreme Court of Virginia placed no effective limiting construction on the statute. Indeed, it characterized the rights of doctors, husbands, and lecturers as "hypothetical," and thus seemed to imply that, although these were in the noncommercial zone, the statute might apply to them, too.

In view of the statute's amendment since Bigelow's conviction in such a way as "effectively to repeal" its prior application, there is no possibility now that the

statute's pre-1972 form will be applied again to appellant or will chill the rights of others. As a practical matter, the issue of its overbreadth has become moot for the future. We therefore decline to rest our decision on overbreadth and we pass on to the further inquiry, of greater moment not only for Bigelow but for others, whether the statute as applied to appellant infringed constitutionally protected speech.

## III

A. The central assumption made by the Supreme Court of Virginia was that the First Amendment guarantees of speech and press are inapplicable to paid commercial advertisements. Our cases, however, clearly establish that speech is not stripped of First Amendment protection merely because it appears in that form. *Pittsburgh Press Co.* v. *Human Rel. Comm'n,* 413 U. S. 376, 384 (1973); *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 266 (1964).

The fact that the particular advertisement in appellant's newspaper had commercial aspects or reflected the advertiser's commercial interests did not negate all First Amendment guarantees. The State was not free of constitutional restraint merely because the advertisement involved sales or "solicitations," *Murdock* v. *Pennsylvania,* 319 U. S. 105, 110–111 (1943), or because appellant was paid for printing it, *New York Times Co.* v. *Sullivan,* 376 U. S., at 266; *Smith* v. *California,* 361 U. S. 147, 150 (1959), or because appellant's motive or the motive of the advertiser may have involved financial gain, *Thomas* v. *Collins,* 323 U. S. 516, 531 (1945). The existence of "commercial activity, in itself, is no justification for narrowing the protection of expression secured by the First Amendment." *Ginzburg* v. *United States,* 383 U. S. 463, 474 (1966).

Although other categories of speech—such as fighting words, *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 572 (1942), or obscenity, *Roth* v. *United States,* 354 U. S. 476, 481–485 (1957), *Miller* v. *California,* 413 U. S. 15, 23 (1973), or libel, *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323 (1974), or incitement, *Brandenburg* v. *Ohio,* 395 U. S. 444 (1969)—have been held unprotected, no contention has been made that the particular speech embraced in the advertisement in question is within any of these categories.

The appellee, as did the Supreme Court of Virginia, relies on *Valentine* v. *Chrestensen,* 316 U. S. 52 (1942), where a unanimous Court, in a brief opinion, sustained an ordinance which had been interpreted to ban the distribution of a handbill advertising the exhibition of a submarine. The handbill solicited customers to tour the ship for a fee. The promoter-advertiser had first attempted to distribute a single-faced handbill consisting only of the advertisement, and was denied permission to do so. He then had printed, on the reverse side of the handbill, a protest against official conduct refusing him the use of wharfage facilities. The Court found that the message of asserted "public interest" was appended solely for the purpose of evading the ordinance and therefore did not constitute an "exercise of the freedom of communicating information and disseminating opinion." *Id.,* at 54. It said:

> "We are equally clear that the Constitution imposes no such restraint on government as respects purely commercial advertising." *Ibid.*

But the holding is distinctly a limited one: the ordinance was upheld as a reasonable regulation of the manner in which commercial advertising could be distributed. The fact that it had the effect of banning a particular handbill does not mean that *Chrestensen* is

authority for the proposition that all statutes regulating commercial advertising are immune from constitutional challenge. The case obviously does not support any sweeping proposition that advertising is unprotected *per se.*[6]

This Court's cases decided since *Chrestensen* clearly demonstrate as untenable any reading of that case that would give it so broad an effect. In *New York Times Co.* v. *Sullivan, supra,* a city official instituted a civil libel action against four clergymen and the New York Times. The suit was based on an advertisement carried in the newspaper criticizing police action against members of the civil rights movement and soliciting contributions for the movement. The Court held that this advertisement, although containing factually erroneous defamatory content, was entitled to the same degree of constitutional protection as ordinary speech. It said:

> "That the Times was paid for publishing the advertisement is as immaterial in this connection as is the fact that newspapers and books are sold." 376 U. S., at 266.

*Chrestensen* was distinguished on the ground that the handbill advertisement there did no more than propose

---

[6] MR. JUSTICE DOUGLAS, who was a Member of the Court when *Chrestensen* was decided and who joined that opinion, has observed: "The ruling was casual, almost offhand. And it has not survived reflection." *Cammarano* v. *United States,* 358 U. S. 498, 514 (1959) (concurring opinion). MR. JUSTICE BRENNAN, joined by JUSTICES STEWART, MARSHALL, and POWELL, has observed: "There is some doubt concerning whether the 'commercial speech' distinction announced in *Valentine* v. *Chrestensen* . . . retains continuing validity." *Lehman* v. *City of Shaker Heights,* 418 U. S. 298, 314 n. 6 (1974) (dissenting opinion). See also *Pittsburgh Press Co.* v. *Human Rel. Comm'n,* 413 U. S. 376, 393 (1973) (BURGER, C. J., dissenting); *id.,* at 398 (DOUGLAS, J., dissenting); *id.,* at 401 (STEWART, J., dissenting).

a purely commercial transaction, whereas the one in *New York Times*

> "communicated information, expressed opinion, recited grievances, protested claimed abuses, and sought financial support on behalf of a movement whose existence and objectives are matters of the highest public interest and concern." *Ibid.*

The principle that commercial advertising enjoys a degree of First Amendment protection was reaffirmed in *Pittsburgh Press Co.* v. *Human Rel. Comm'n,* 413 U. S. 376 (1973). There, the Court, although divided, sustained an ordinance that had been construed to forbid newspapers to carry help-wanted advertisements in sex-designated columns except where based upon a bona fide occupational exemption. The Court did describe the advertisements at issue as "classic examples of commercial speech," for each was "no more than a proposal of possible employment." *Id.,* at 385. But the Court indicated that the advertisements would have received some degree of First Amendment protection if the commercial proposal had been legal. The illegality of the advertised activity was particularly stressed:

> "Any First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity." *Id.,* at 389.

B. The legitimacy of appellant's First Amendment claim in the present case is demonstrated by the important differences between the advertisement presently at

issue and those involved in *Chrestensen* and in *Pittsburgh Press*. The advertisement published in appellant's newspaper did more than simply propose a commercial transaction. It contained factual material of clear "public interest." Portions of its message, most prominently the lines, "Abortions are now legal in New York. There are no residency requirements," involve the exercise of the freedom of communicating information and disseminating opinion.

Viewed in its entirety, the advertisement conveyed information of potential interest and value to a diverse audience—not only to readers possibly in need of the services offered, but also to those with a general curiosity about, or genuine interest in, the subject matter or the law of another State and its development, and to readers seeking reform in Virginia. The mere existence of the Women's Pavilion in New York City, with the possibility of its being typical of other organizations there, and the availability of the services offered, were not unnewsworthy. Also, the activity advertised pertained to constitutional interests. See *Roe* v. *Wade,* 410 U. S. 113 (1973), and *Doe* v. *Bolton,* 410 U. S. 179 (1973). Thus, in this case, appellant's First Amendment interests coincided with the constitutional interests of the general public.[7]

Moreover, the placement services advertised in appellant's newspaper were legally provided in New York at that time.[8] The Virginia Legislature could not have

---

[7] It was argued, too, that under the circumstances the appearance of the advertisement in the appellant's newspaper was "an implicit editorial endorsement" of its message. Brief for Appellant 29.

[8] Subsequent to Bigelow's publication of the advertisement in February 1971, New York adopted Laws 1971, c. 725, effective July 1, 1971, amended by Laws 1972, c. 17, § 1, now codified as Art.

regulated the advertiser's activity in New York, and obviously could not have proscribed the activity in that State.[9] *Huntington* v. *Attrill,* 146 U. S. 657, 669 (1892).

45 of the State's Public Health Law (Supp. 1974–1975). Section 4500 contains a legislative finding:

"Medical referral services, organized as profit making enterprises within this state, have been . . . in violation of the standards of ethics and public policy applicable to the practice of medicine and which would be violations of standards of professional conduct if the acts were performed by physicians. . . . It is hereby declared to be the public policy of this state . . . that such profit making medical referral service organizations be declared to be invalid and unlawful in this state."

Section 4501 (1) provides:

"No person, firm, partnership, association or corporation, or agent or employee thereof, shall engage in for profit any business or service which in whole or in part includes the referral or recommendation of persons to a physician, hospital, health related facility, or dispensary for any form of medical care or treatment of any ailment or physical condition. The imposition of a fee or charge for any such referral or recommendation shall create a presumption that the business or service is engaged in for profit."

A violation of the statute is a misdemeanor punishable by imprisonment for not longer than one year or a fine of not more than $5,000 or both. § 4502 (1). Article 45 expressly is made inapplicable to a nonprofit corporation exempt from federal income taxation under § 501 (c) of the Internal Revenue Code of 1954, 26 U. S. C. § 501 (c). § 4503.

The 1971 statute has been upheld against constitutional challenge. *S. P. S. Consultants, Inc.* v. *Lefkowitz,* 333 F. Supp. 1373 (SDNY 1971).

[9] In 1972, after Bigelow's prosecution was begun, Virginia adopted Acts of Assembly 1972, c. 642, now codified as Va. Code Ann. § 18.1–417.2 (Supp. 1975). This statute is similar to the New York statute described in n. 8, *supra,* and is directed at for-profit medical referrals within Virginia. The statute prohibits engaging for profit "in any business which in whole or in part includes the referral or recommendation of persons to a physician, hospital, health related facility, or dispensary for any form of medical care or treatment of any ailment or physical condition." Acceptance of a fee for any

Neither could Virginia prevent its residents from traveling to New York to obtain those services or, as the State conceded, Tr. of Oral Arg. 29, prosecute them for going there. See *United States* v. *Guest,* 383 U. S. 745, 757–759 (1966); *Shapiro* v. *Thompson,* 394 U. S. 618, 629–631 (1969); *Doe* v. *Bolton,* 410 U. S., at 200. Virginia possessed no authority to regulate the services provided in New York—the skills and credentials of the New York physicians and of the New York professionals who assisted them, the standards of the New York hospitals and clinics to which patients were referred, or the practices and charges of the New York referral services.

A State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State. It may seek to disseminate information so as to enable its citizens to make better informed decisions when they leave. But it may not, under the guise of exercising internal police powers, bar

---

such referral or recommendation "shall create a presumption that the business is engaged in such service for profit." Violation of the statute is a misdemeanor punishable by imprisonment for not longer than one year or a fine of not more than $5,000, or both.

By a 1973 amendment, Acts of Assembly 1973, c. 529, to its statute dealing with unprofessional conduct by a member of the medical or a related profession, Virginia prohibits advertising by a physician. Specifically, Va. Code Ann. § 54–317 (1974) now provides:

"Any practitioner of medicine . . . shall be considered guilty of unprofessional conduct if he:

.        .        .        .        .

"(13) Advertises to the general public directly or indirectly in any manner his professional services, their costs, prices, fees, credit terms or quality."

See also Va. Code Ann. §§ 54–278.1 and 54–317 (4), (5), and (6) (1974).

We, of course, have no occasion to comment here on whatever constitutional issue, if any, may be raised with respect to these statutes.

a citizen of another State from disseminating information about an activity that is legal in that State.

C. We conclude, therefore, that the Virginia courts erred in their assumptions that advertising, as such, was entitled to no First Amendment protection and that appellant Bigelow had no legitimate First Amendment interest. We need not decide in this case the precise extent to which the First Amendment permits regulation of advertising that is related to activities the State may legitimately regulate or even prohibit.[10]

---

[10] We have no occasion, therefore, to comment on decisions of lower courts concerning regulation of advertising in readily distinguishable fact situations. Wholly apart from the respective rationales that may have been developed by the courts in those cases, their results are not inconsistent with our holding here. In those cases there usually existed a clear relationship between the advertising in question and an activity that the government was legitimately regulating. See, *e. g., United States* v. *Bob Lawrence Realty, Inc.,* 474 F. 2d 115, 121 (CA5), cert. denied, 414 U. S. 826 (1973); *Rockville Reminder, Inc.* v. *United States Postal Service,* 480 F. 2d 4 (CA2 1973); *United States* v. *Hunter,* 459 F. 2d 205 (CA4), cert. denied, 409 U. S. 934 (1972).

Nor need we comment here on the First Amendment ramifications of legislative prohibitions of certain kinds of advertising in the electronic media, where the "unique characteristics" of this form of communication "make it especially subject to regulation in the public interest." *Capital Broadcasting Co.* v. *Mitchell,* 333 F. Supp. 582, 584 (DC 1971), aff'd, 405 U. S. 1000 (1972). See also *Banzhaf* v. *FCC,* 132 U. S. App. D. C. 14, 405 F. 2d 1082 (1968), cert. denied *sub nom. Tobacco Institute, Inc.* v. *FCC,* 396 U. S. 842 (1969); *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94 (1973).

Our decision also is in no way inconsistent with our holdings in the Fourteenth Amendment cases that concern the regulation of professional activity. See *North Dakota Pharmacy Bd.* v. *Snyder's Stores,* 414 U. S. 156 (1973); *Head* v. *New Mexico Board,* 374 U. S. 424 (1963); *Williamson* v. *Lee Optical Co.,* 348 U. S. 483 (1955); *Barsky* v. *Board of Regents,* 347 U. S. 442 (1954); *Semler* v. *Dental Examiners,* 294 U. S. 608 (1935).

Advertising, like all public expression, may be subject to reasonable regulation that serves a legitimate public interest. See *Pittsburgh Press Co.* v. *Human Rel. Comm'n, supra; Lehman* v. *City of Shaker Heights,* 418 U. S. 298 (1974).[11] To the extent that commercial activity is subject to regulation, the relationship of speech to that activity may be one factor, among others, to be considered in weighing the First Amendment interest against the governmental interest alleged. Advertising is not thereby stripped of all First Amendment protection. The relationship of speech to the marketplace of products or of services does not make it valueless in the marketplace of ideas.

The Court has stated that "a State cannot foreclose the exercise of constitutional rights by mere labels." *NAACP* v. *Button,* 371 U. S., at 429. Regardless of the particular label asserted by the State—whether it calls speech "commercial" or "commercial advertising" or "solicitation"—a court may not escape the task of assessing the First Amendment interest at stake and weighing it against the public interest allegedly served by the regulation. The diverse motives, means, and messages of advertising may make speech "commercial" in widely varying degrees. We need not decide here the extent to which constitutional protection is afforded commercial advertising under all circumstances and in the face of all kinds of regulation.

## IV

The task of balancing the interests at stake here was one that should have been undertaken by the Virginia courts before they reached their decision. We need not

---

[11] See also *Adderley* v. *Florida,* 385 U. S. 39, 46–48 (1966); *Cox* v. *Louisiana,* 379 U. S. 536, 554 (1965); *Poulos* v. *New Hampshire,* 345 U. S. 395, 405 (1953); *Kunz* v. *New York,* 340 U. S. 290, 293–294 (1951); *Cox* v. *New Hampshire,* 312 U. S. 569, 575–576 (1941).

remand for that purpose, however, because the outcome is readily apparent from what has been said above.

In support of the statute, the appellee contends that the commercial operations of abortion referral agencies are associated with practices, such as fee splitting, that tend to diminish, or at least adversely affect, the quality of medical care, and that advertising of these operations will lead women to seek services from those who are interested only or mainly in financial gain apart from professional integrity and responsibility.

The State, of course, has a legitimate interest in maintaining the quality of medical care provided within its borders. *Barsky* v. *Board of Regents,* 347 U. S. 442, 451 (1954). No claim has been made, however, that this particular advertisement in any way affected the quality of medical services within Virginia. As applied to Bigelow's case, the statute was directed at the publishing of informative material relating to services offered in another State and was not directed at advertising by a referral agency or a practitioner whose activity Virginia had authority or power to regulate.

To be sure, the agency-advertiser's practices, although not then illegal, may later have proved to be at least "inimical to the public interest" in New York. *S. P. S. Consultants, Inc.* v. *Lefkowitz,* 333 F. Supp. 1373, 1378 (SDNY 1971).[12] But this development would not justify a Virginia statute that forbids Virginians from using in New York the then legal services of a local New York agency. Here, Virginia is really asserting an interest in regulating what Virginians may *hear* or *read* about the New York services. It is, in effect, advancing an interest in shielding its citizens from information about activities

---

[12] See *State* v. *Abortion Information Agency, Inc.,* 69 Misc. 2d 825, 323 N. Y. S. 2d 597 (1971); see also *Mitchell Family Planning, Inc.* v. *City of Royal Oak,* 335 F. Supp. 738 (ED Mich. 1972).

outside Virginia's borders, activities that Virginia's police powers do not reach. This asserted interest, even if understandable, was entitled to little, if any, weight under the circumstances.

No claim has been made, nor could any be supported on this record, that the advertisement was deceptive or fraudulent,[13] or that it related to a commodity or service that was then illegal in either Virginia or in New York, or that it otherwise furthered a criminal scheme in Virginia.[14] There was no possibility that appellant's activity would invade the privacy of other citizens, *Breard* v. *Alexandria, supra,* or infringe on other rights. Observers would not have the advertiser's message thrust upon them as a captive audience. *Lehman* v. *City of Shaker Heights, supra; Packer Corp.* v. *Utah,* 285 U. S. 105, 110 (1932).

The strength of appellant's interest was augmented by the fact that the statute was applied against him as publisher and editor of a newspaper, not against the advertiser or a referral agency or a practitioner. The prosecution thus incurred more serious First Amendment overtones.

If application of this statute were upheld under these circumstances, Virginia might exert the power sought here over a wide variety of national publications or interstate newspapers carrying advertisements similar to the one that appeared in Bigelow's newspaper or containing articles on the general subject matter to which

[13] See Note, Freedom of Expression in a Commercial Context, 78 Harv. L. Rev. 1191, 1197–1198 (1965); Developments in the Law—Deceptive Advertising, 80 Harv. L. Rev. 1005, 1010–1015 (1967).

[14] We are not required to decide here what the First Amendment consequences would be if the Virginia advertisement promoted an activity in New York which was then illegal in New York. An example would be an advertisement announcing the availability of narcotics in New York City when the possession and sale of narcotics was proscribed in the State of New York.

the advertisement referred.[15]   Other States might do the same.   The burdens thereby imposed on publications would impair, perhaps severely, their proper functioning.   See *Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S. 241, 257–258 (1974).   We know from experience that "liberty of the press is in peril as soon as the government tries to compel what is to go into a newspaper." 2 Z. Chafee, Government and Mass Communications 633 (1947).   The policy of the First Amendment favors dissemination of information and opinion, and "[t]he guarantees of freedom of speech and press were not designed to prevent 'the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential . . . .' 2 Cooley, Constitutional Limitations 886 (8th ed.)." *Curtis Publishing Co.* v. *Butts*, 388 U. S. 130, 150 (1967) (opinion of Harlan, J.).

We conclude that Virginia could not apply Va. Code Ann. § 18.1–63 (1960), as it read in 1971, to appellant's publication of the advertisement in question without unconstitutionally infringing upon his First Amendment rights.   The judgment of the Supreme Court of Virginia is therefore reversed. .

*It is so ordered.*

Mr. Justice Rehnquist, with whom Mr. Justice White joins, dissenting.

The Court's opinion does not confront head-on the question which this case poses, but makes contact with

---

[15] The State so indicated at oral argument.   Tr. of Oral Arg. 37–38.   It, however, was never so applied.   In the light of its "effective repeal," as the State's counsel observed during the oral argument, "[w]e will never know" how far, under appellee's theory, it might have reached.   *Id.,* at 38.

it only in a series of verbal sideswipes. The result is the fashioning of a doctrine which appears designed to obtain reversal of this judgment, but at the same time to save harmless from the effects of that doctrine the many prior cases of this Court which are inconsistent with it.

I am in agreement with the Court, *ante,* at 817–818, that Virginia's statute cannot properly be invalidated on grounds of overbreadth,[1] given that the sole prosecution which has ever been brought under this now substantially altered statute is that now in issue. "It is the law as applied that we review, not the abstract, academic questions which it might raise in some more doubtful case." *Saia* v. *New York,* 334 U. S. 558, 571 (1948) (Jackson, J., dissenting).

Since the Court concludes, apparently from two lines of the advertisement, *ante,* at 812, that it conveyed information of value to those interested in the "subject matter or the law of another State and its development" and to those "seeking reform in Virginia," *ante,* at 822, and since the ad relates to abortion, elevated to constitutional stature by the Court, it concludes that this advertisement is entitled to something more than the limited constitutional protection traditionally accorded commercial advertising. See *ante,* at 825 n. 10. Although recognizing that "[a]dvertising, like all public expression, may be subject to reasonable regulation that serves a legitimate public interest," *ante,* at 826, the Court for reasons not entirely clear to me concludes that Virginia's interest is of "little, if any, weight." *Ante,* at 828.

---

[1] The Court, *ante,* at 817, states that the Virginia Supreme Court placed no limiting interpretation on its statute and that it implied that the statute might apply to doctors, husbands, and lecturers. The Court is in error: the Virginia Supreme Court stated that it would not interpret the statute to encompass such situations. 213 Va. 191, 198, 191 S. E. 2d 173, 177 (1972).

If the Court's decision does, indeed, turn upon its conclusion that the advertisement here in question was protected by the First and Fourteenth Amendments, the subject of the advertisement ought to make no difference. It will not do to say, as the Court does, that this advertisement conveyed information about the "subject matter or the law of another State and its development" to those "seeking reform in Virginia," and that it related to abortion, as if these factors somehow put it on a different footing from other commercial advertising. This was a proposal to furnish services on a commercial basis, and since we have always refused to distinguish for First Amendment purposes on the basis of content, it is no different from an advertisement for a bucket shop operation or a Ponzi scheme which has its headquarters in New York. If Virginia may not regulate advertising of commercial abortion agencies because of the interest of those seeking to reform Virginia's abortion laws, it is difficult to see why it is not likewise precluded from regulating advertising for an out-of-state bucket shop on the ground that such information might be of interest to those interested in repealing Virginia's "blue sky" laws.

As a threshold matter the advertisement appears to me, as it did to the courts below, to be a classic commercial proposition directed toward the exchange of services rather than the exchange of ideas. It was apparently also so interpreted by the newspaper which published it which stated in apparent apology in its following issue that the " 'Weekly collective has since learned that this abortion agency . . . as well as a number of other commercial groups are charging women a fee for a service which is done free by Women's Liberation, Planned Parenthood, and others.' " 213 Va. 191, 194, 191 S. E. 2d 173, 175 (1972). Whatever slight factual content the advertisement may contain and

whatever expression of opinion may be laboriously drawn from it does not alter its predominantly commercial content. "If that evasion were successful, every merchant who desires to broadcast . . . need only append a civic appeal, or a moral platitude, to achieve immunity from the law's command." *Valentine* v. *Chrestensen,* 316 U. S. 52, 55 (1942). See, *e. g., Ginzburg* v. *United States,* 383 U. S. 463, 474 n. 17 (1966). I am unable to perceive any relationship between the instant advertisement and that for example in issue in *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 292 (1964). Nor am I able to distinguish this commercial proposition from that held to be purely commercial in *Pittsburgh Press Co.* v. *Human Rel. Comm'n,* 413 U. S. 376 (1973). As the Court recognizes, *ante,* at 819–821, a purely commercial proposal is entitled to little constitutional protection.

Assuming *arguendo* that this advertisement is something more than a normal commercial proposal, I am unable to see why Virginia does not have a legitimate public interest in its regulation. The Court apparently concedes, *ante,* at 825 n. 10, and our cases have long held, that the States have a strong interest in the prevention of commercial advertising in the health field—both in order to maintain high ethical standards in the medical profession and to protect the public from unscrupulous practices. See, *e. g., Semler* v. *Dental Examiners,* 294 U. S. 608, 612 (1935); *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 490–491 (1955); *North Dakota Pharmacy Bd.* v. *Snyder's Stores,* 414 U. S. 156 (1973). And the interest asserted by the Supreme Court of Virginia in the Virginia statute was the prevention of commercial exploitation of those women who elect to have an abortion:

"It is clearly within the police power of the state to enact reasonable measures to ensure that pregnant

women in Virginia who decide to have abortions come to their decisions without the commercial advertising pressure usually incidental to the sale of a box of soap powder. And the state is rightfully interested in seeing that Virginia women who do decide to have abortions obtain proper medical care and do not fall into the hands of those interested only in financial gain, and not in the welfare of the patient." 213 Va., at 196, 191 S. E. 2d, at 176.

The concern of the Virginia Supreme Court was not a purely hypothetical one. As the majority notes, *ante,* at 822-823, n. 8, although New York at the time of this advertisement allowed profitmaking abortion referral agencies, it soon thereafter passed legislation prohibiting commercial advertisement of the type here in issue. The court in *S. P. S. Consultants, Inc.* v. *Lefkowitz,* 333 F. Supp. 1373, 1378 (SDNY 1971), quoted the author of that legislation on the reasons for its passage:

" 'Because New York State has the most liberal abortion statute within the Continental United States, thousands of women from all over the country are coming into New York State . . . . [M]ost of these women came here through referral agencies who advertise nationally. These agencies, for a sizeable fee, make all abortion arrangements for a patient. We also learned that certain hospitals give discounts to these lucrative, profit-making organizations. Thus, at the expense of desperate, frightened women these agencies are making a huge profit— some, such a huge profit that our Committee members were actually shocked."

See, *e. g., State* v. *Mitchell,* 66 Misc. 2d 514, 321 N. Y. S. 2d 756 (1971); *State* v. *Abortion Information Agency, Inc.,* 69 Misc. 2d 825, 323 N. Y. S. 2d 597 (1971).

Without denying the power of either New York or Virginia to prohibit advertising such as that in issue where both publication of the advertised activity and the activity itself occur in the same State, the Court instead focuses on the multistate nature of this transaction, concluding that a State "may not, under the guise of exercising internal police powers, bar a citizen of another State from disseminating information about an activity that is legal in that State." *Ante,* at 824–825. And the Court goes so far as to suggest that it is an open question whether a State may constitutionally prohibit an advertisement containing an invitation or offer to engage in activity which is criminal both in the State of publication and in the proposed situs of the crime. See *ante,* at 828 n. 14.

The source of this rigid territorial limitation on the power of the States in our federal system to safeguard the health and welfare of their citizens is not revealed. It is surely not to be found in cases from this Court.[2]

_____

[2] The Court, *ante,* at 822–823, relies on *Huntington* v. *Attrill,* 146 U. S. 657, 669 (1892), for its major premise that Virginia could not regulate the relations of the advertiser with its residents since these occurred in New York. To the extent that the Court reads *Huntington* to impose a rigid and unthinking territorial limitation, whose constitutional source is unspecified, on the power of the States to regulate conduct, it is plainly wrong. The passage referred to by the Court in the *Huntington* opinion is dictum and appears to be a statement of then-prevalent common-law rules rather than a constitutional holding. And the attempt to impose such a rigid limitation on the power of the States was first rejected by Mr. Justice Holmes, writing for the Court in *Strassheim* v. *Daily,* 221 U. S. 280, 285 (1911):

"Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a State in punishing the cause of the harm as if he had been present at the effect . . . ."

Mr. Justice McKenna in *Hyde* v. *United States,* 225 U. S. 347, 363 (1912), observed that "this must be so if we would fit the laws

Beginning at least with our decision in *Delamater* v. *South Dakota,* 205 U. S. 93, 100 (1907), we have consistently recognized that irrespective of a State's power to regulate extraterritorial commercial transactions in which its citizens participate it retains an independent power to regulate the business of commercial solicitation and advertising within its borders. Thus, for example, in *Head* v. *New Mexico Board,* 374 U. S. 424 (1963), we upheld the power of New Mexico to prohibit commercial advertising by a New Mexico radio station of optometric services provided in Texas. Mr. JUSTICE BRENNAN, concurring in that opinion, noted that a contrary result might well produce "a 'no-man's land' . . . in which there would be at best selective policing of the various advertising abuses and excesses which are now very extensively regulated by state law." *Id.,* at 446. See, *e. g., Packer Corp.* v. *Utah,* 285 U. S. 105 (1932); *Breard* v. *Alexandria,* 341 U. S. 622 (1951).

Were the Court's statements taken literally, they would presage a standard of the lowest common denominator for commercial ethics and business conduct. Securities issuers could circumvent the established blue-sky laws of States which had carefully drawn such laws for the protection of their citizens by establishing as a situs for transactions those States without such regulations, while spreading offers throughout the country. Loan sharks might well choose States with unregulated small loan industries, luring the unwary with immune

and their administration to the acts of men and not be led away by mere 'bookish theorick.' " See, *e. g., Skiriotes* v. *Florida,* 313 U. S. 69, 74–75 (1941); *Ford* v. *United States,* 273 U. S. 593, 620–621 (1927). To the extent that the Court's conclusion that Virginia has a negligible interest in its statute proceeds from the assumption that the State was without power to regulate the extraterritorial activities of the advertiser involving Virginia residents, it is quite at war with our prior cases.

commercial advertisements. And imagination would place the only limit on the use of such a "no-man's land" together with artificially created territorial contacts to bilk the public and circumvent long-established state schemes of regulation.

Since the Court saves harmless from its present opinion our prior cases in this area, *ante,* at 825 n. 10, it may be fairly inferred that it does not intend the results which might otherwise come from a literal reading of its opinion. But solely on the facts before it, I think the Court today simply errs in assessing Virginia's interest in its statute because it does not focus on the impact of the practices in question on the State. Cf. *Young* v. *Masci,* 289 U. S. 253 (1933). Although the commercial referral agency, whose advertisement in Virginia was barred, was physically located outside the State, this physical contact says little about Virginia's concern for the touted practices. Virginia's interest in this statute lies in preventing commercial exploitation of the health needs of its citizens. So long as the statute bans commercial advertising by publications within the State, the extraterritorial location at which the services are actually provided does not diminish that interest.

Since the statute in question is a "reasonable regulation that serves a legitimate public interest," *ante,* at 826, I would affirm the judgment of the Supreme Court of Virginia.