Fuchsberg, J.
(concurring). I concur in the majority’s decision today that the ordinance before us is, as presently worded, unconstitutional. As I see it, the difference in our views basically rests on the extent to which any regulation drawn to replace the one stricken here could, even in lesser measure, contain a commercial-noncommercial distinction. For, on my analysis, the defect here goes beyond overbreadth.
Pamphlets, leaflets and brochures have traditionally played an important role in the distribution of ideas and information *531 in our Nation. More often than not, they have been the only means open to persons who are without access to more widespread forms of communication. The right to their use is no less important today than it has been in the past.
Neither the Federal Constitution nor our State Constitution specifies that one kind of speech is to be preferred over another. In my view, it is not, therefore, for us to decide whether commercial speech is less important than speech which is more overtly political or social in nature. That determination is itself a matter of individual freedom. To one citizen, the most important subject on which to communicate may be politics, constitutional rights, or the administration of justice; to another it may be what merchandise is available in the market at what price. Indeed, as a practical matter, most communications may have a thread of both the commercial and the noncommercial running through them.
Does a consumer’s concern with the rising price of electricity lose its commercial character when he campaigns for the election of a legislator who espouses sterner utility regulation? Is one citizen’s desire to lobby for tax reforms to his own financial benefit somehow less economic in nature than another’s interest in obtaining goods at the lowest price? I think not.
Until recently, however, handbilling has been the subject of regulation according to whether it was commercial or noncommercial in nature, based on the United States Supreme Court’s holding in the now largely repudiated case of Valentine v Chrestensen (316 US 52), which involved the predecessor to the very ordinance now before us. Indeed, no one would dispute that much of the Valentine holding was cast aside by the Supreme Court itself in Bigelow v Virginia (421 US 809, 818, 819). The Bigelow court did, however, remark that Valentine might still have viability to the extent that it purported to be a "reasonable regulation of the manner” in which commercial messages were given to the public (421 US, at p 819).
The Bigelow case involved newspaper advertisements in Virginia for an abortion referral service located in New York State. Such services were legal in New York but not in Virginia. The Supreme Court invalidated the law under which the editor of the newspaper had been convicted at least in part because the content of the advertisement he printed was addressed to a medical problem of serious social dimensions *532 (at p 822). Understandably, the court left open the extent to which commercial speech of a more mundane nature might be regulated, saying, "We need not decide in this case the precise extent to which the First Amendment permits regulation of advertising that is related to activities the State may legitimately regulate or even prohibit” (at p 825).
Now, in Virginia Pharmacy Bd. v Virginia Consumer Council (425 US 748), the Supreme Court appears to have answered the question it left open in Bigelow in the negative, making clear that commercial speech which "does 'no more than propose a commercial transaction’ ” (Virginia Pharmacy Bd., supra, at p 762, quoting Pittsburgh Press Co. v Human Relations Comm., 413 US 376, 385) is fully entitled to constitutional protection.
Significantly, the respondent, urging the conclusion that commercial handbilling may still be forbidden while noncommercial activity of the same sort may be permitted, cites to the echoes of Valentine in the Bigelow case as though the Virginia Pharmacy Bd. case had changed nothing. It finds the ordinance here justified by the "significant governmental interest” involved and by the availability of "alternative channels for communication”, which concededly are conditions laid down by Virginia Pharmacy Bd., but it ignores the United States Supreme Court’s further requirement, enunciated in that case, that the restriction must also be "justified without reference to the content of the regulated speech” (at p 771).
A regulation which permits handbilling of noncommercial material and forbids the same activity when commercial material is involved is inescapably a regulation which makes "reference to the content” of the handbills so forbidden. Indeed, it is a regulation which rests entirely on the content of the commercial handbill as somehow less protected than other, loftier kinds of speech. As I read it, Virginia Pharmacy Bd. wipes out such distinctions, on the grounds that they are unnecessary in a free society and, as a practical matter, incapable of being drawn on any rationally defensible basis.
In emphasizing the difficulty in characterizing the content of speech as "commercial” or "non-commercial” altogether, the court pointed to the fact that, even under its own past cases, speech is protected even when it is "carried in a form *533 that is 'sold’ for profit” (at p 761, citing Smith v California, 361 US 147, 150 [books]; Joseph Burstyn, Inc. v Wilson, 343 US 495, 501 [motion pictures]; Murdock v Pennsylvania, 319 US 105, 111 [religious literature]). And it is protected even when the speaker has a purely economic interest in the subject under discussion (at p 762, citing to numerous labor cases upholding union members’ rights to disseminate their views on a particular economic dispute with an employer). Indeed, the speech of a pharmacist such as the one before the court in the Virginia Pharmacy Bd. case itself would be protected under prior cases if he had disguised his commercial message in a format of factual information about the problems involved in intelligent purchasing of drugs by consumers (at p 765, citing to the Bigelow case, and Thornhill v Alabama, 310 US 88, 102). Said the court, "We see little point in requiring him to do so, and little difference if he does not” (at p 765).
Further, in holding the commercial doctrine inimical to a self-governing democracy, the court made clear that, "even if the First Amendment were thought to be primarily an instrument to enlighten public decisionmaking in a democracy * * * the free flow of commercial information”, "is indispensable to the proper allocation of resources in a free enterprise system” (at p 765). Thus, the same economy which supplies the basis for the Supreme Court’s holding that the free flow of information to consumers is vital also supplies the basis for holding that free access to less expensive channels of communication is vital to entrepreneurs who would speak to the public. Needless to say, not every business is as profitable as its fellows; not everyone can easily afford expensive newspaper and television advertising. The margin between success and failure is often very narrow. Clearly, the smaller the business the more this tends to be the case. But the right, if not the need, is universal.
To be sure, that is not to say that, under the Supreme Court’s new formulation of permissible areas of regulation, some forms of communication with the public can never be forbidden, even, for that matter, for conventionally sacred political communications, when the State’s interest is sufficiently "significant”. Certainly we presently regulate the use of our sidewalks and streets, our parks and other places, where the public safety so requires (cf., e.g., Cox v Louisiana, *534 379 US 559; Grayned v City of Rockford, 408 US 104; Kovacs v Cooper, 336 US 77; People v Taub, 37 NY2d 530; People v Katz, 21 NY2d 132).
But we can do so only without "reference to the content” of the speech and because other interests require acknowledgment. If that results in the closing of one channel of communication, at least at certain times and in certain places, the fact that other channels are open plays an important part in our right to so regulate I believe. What we should not do now is close one channel only to commercial speech, while leaving that same channel open to others whose utterances are somehow more acceptable.
In sum, handbilling has long occupied a special, almost indispensible place in our society (see Lovell v Grifñn, 303 US 444; Schneider v State, 308 US 147, 162). For that reason alone, a total ban on handbilling without respect to its content is not acceptable; the only alternative must be to permit commercial handbilling as well. Both may be subject to reasonable regulation, of course provided the attempts to do so meet the other criteria set forth above and are not so vague as to violate the prohibition upon unwarranted police discretion set forth in Cox v Louisiana (379 US 559, supra; see, also, People v Katz, 21 NY2d 132, supra). If commercial and noncommercial handbilling may not be distinguished, then neither may be banned. Instead, both must then be permitted.