**METPATH, INC., Plaintiff,**

v.

**Beverlee MYERS, as Director of the Department of Health Services of the State of California, F. W. Hartmann, as Chief of Laboratory Field Services of the Department of Health Services of the State of California, and the Department of Health Services of the State of California, Defendants.**

**No. C–78–1705 WHO.**

United States District Court,
N. D. California.

Oct. 16, 1978.

---

Quentin L. Kopp, Kopp & Di Franco, San Francisco, Cal., Charles H. Miller, Marshall, Bratter, Greene, Allison & Tucker, New York City, for plaintiff.

Evelle J. Younger, Atty. Gen. of Cal., Charlton G. Holland, III, John Davidson, Deputy Attys. Gen., San Francisco, Cal., for defendants.

## OPINION

ORRICK, District Judge.

This case calls into question the constitutionality of a California statute (herein "the statute") authorizing the State of California Department of Health Services (herein "California" or "the State") to revoke or suspend the license of any clinical laboratory which advertises "clinical laboratory procedures to the lay public in magazines, newspapers, directories, circulars, signs, etc. * * * " [1]

For the reasons hereinafter stated, the Court holds that the statute offends the Free Speech Clause of the First Amendment and grants judgment, including injunctive and declaratory relief, in favor of the plaintiff, Metpath, Inc. ("Metpath") and against the State in accordance with this Opinion, which shall constitute the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

### I.

Metpath is a clinical laboratory company incorporated under the laws of New York

1. In relevant part, the statute provides:
 "Licenses issued by the department may be denied, revoked or suspended for any of the following reasons:
 &ast; &ast; &ast; &ast; &ast; &ast;
 (h) The advertising of clinical laboratory procedures to the lay public in magazines, newspapers, directories, circulars, signs, etc., or any advertising which is false or misleading."
 Cal.Bus. & Prof.Code § 1320 (Deering) (Supp. 1978).

2. The three advertisements at issue in this proceeding are appended hereto as plaintiff's Exhibits 1, 2 and 3.
 Exhibit 1 describes the results of recent medical research which allegedly demonstrates a correlation between certain cholesterol levels and the frequency of heart disease. The advertisement further indicates that body levels of the cholesterol (referred to as HDL, for High Density Lipoproteins) can be increased through regular exercise and proper diet, and that Metpath performs a laboratory procedure capable of determining the level of HDL present in the patient's blood. The message closes with the statement, contained in all three advertisements, that "even though all laboratory tests must be ordered through your physician, we thought you should know something about us." Exhibit 2 describes a new clinical laboratory test, introduced by Metpath, which measures the amount of glucose stored by the red blood cells of the patient. According to the advertisement, the test is more accurate and less expensive than similar procedures, and will enable physicians to prescribe with greater precision the daily insulin requirements of diabetic patients.
 Exhibit 3 is more general in nature, and aims at extolling the virtues of Metpath itself. The advertisement lauds alleged advances by Metpath in the performance of high quality laboratory procedures with greater efficiency and at reduced prices.

and having its principal place of business in New Jersey. Its business consists of performing clinical laboratory tests in the health care field on written requests from duly licensed physicians. It is licensed to do business in many states, including California. Recently, it inaugurated a national advertising campaign aimed at informing the public about itself (institutional advertising) and describing some of the laboratory tests which it performs.[2]

In response to the publication of the advertisements in California, the State, citing only the prohibition against "advertising * * * to the lay public," demanded that Metpath cease all advertising forthwith or face proceedings for license revocation pursuant to the statute.[3]

Metpath then brought this action pursuant to 42 U.S.C. § 1983[4] and its jurisdictional counterpart, 28 U.S.C. § 1343(3), seeking injunctive and declaratory relief against enforcement of the statute, which it alleged to be in violation of the First and Fourteenth Amendments.[5] California's answer was tantamount to a general denial. Following some initial skirmishing over the accuracy of the factual material contained in the advertisements,[6] the parties stipulated that the narrow issue to be decided by the Court is whether or not the statute violates the First and Fourteenth Amendments. Pursu-

ant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, and with the mutual consent of the parties, the Court advanced the matter on its calendar, consolidating the hearing on the motion for a preliminary injunction with a trial on the merits.

## II.

Since the enactment of this statute in 1951,[7] the appellate courts of the State of California have never had occasion to construe its terms. This raises the important threshold question of whether or not this Court, with careful regard for the proper relationship between state and federal tribunals, should abstain from deciding the constitutional issue presented.

■ Although the doctrine of abstention is a narrow one, to be applied only in "exceptional circumstances," *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), it is appropriate to invoke it when the challenged state statute is susceptible to a construction by the state court which would avoid or modify the federal constitutional question. *Bellotti v. Baird,* 428 U.S. 132, 146–47, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976); *Lake Carriers' Association v. MacMullan,* 406 U.S. 498, 510–11, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972). The

---

3. Revocation proceedings by the State are required to be conducted in accordance with the administrative procedures set forth in Title 2 of the Government Code. Cal.Bus. & Prof.Code § 1322 (Deering) (1975).

4. 42 U.S.C. § 1983 provides:
 "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

5. The First Amendment is applicable to the states through the Due Process Clause of the

Fourteenth Amendment. *Bates v. State Bar of Arizona,* 433 U.S. 350, 353, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), *rehearing denied,* 434 U.S. 881, 98 S.Ct. 242, 54 L.Ed.2d 1614 (1977).

6. In materials submitted by the State subsequent to its answer, it appeared to argue that the advertisements were false and misleading, and thus subject to attack under the second (and unchallenged) provision of the statute, which prohibits "advertising which is false or misleading." Defendants' Brief at 21–23; Declaration of Ephraim Kahn. However, in further submissions, as well as in oral argument, the State conceded that, for purposes of this litigation, it would withdraw any objection to the content of plaintiff's advertisements.

7. 1951 Cal.Stats., ch. 1727 § 2.

Supreme Court in *Baggett v. Bullitt,* 377 U.S. 360, 376–77, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964), has pointed out that most frequently "the unsettled issue of state law * * * [concerns] the applicability of the challenged statute to a certain person or a defined course of conduct, whose resolution in a particular manner would eliminate the constitutional issue and terminate the litigation." But it is clear that the mere existence of an unconstrued state statute is not alone sufficient to authorize abstention. *Id.* at 375, 84 S.Ct. at 1325.

■ There is no such "unsettled" state law issue in this case. On its face, the "lay advertising" clause of the statute clearly applies to the advertisements published by plaintiff. Neither in its brief nor during oral argument did the State suggest any alternative construction by which the statute would fail to reach these publications, and thus render moot the constitutional issue. To the contrary, the State argues vehemently that the statute *does* apply. On these facts, there is no issue upon which this Court should defer to a state forum.

There is another and more important reason for not invoking the doctrine of abstention in the circumstances presented here. The Supreme Court has been extremely reluctant to apply the doctrine where First Amendment rights are at stake, since the delay occasioned by state court adjudication might inhibit the exercise of First Amendment freedoms. *Id.* at 378–79, 84 S.Ct. 1316; *Procunier v. Martinez,* 416 U.S. 396, 404, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). In *Terry v. California State Board of Pharmacy,* 395 F.Supp. 94 (N.D.Cal.1975), *aff'd,* 426 U.S. 913, 96 S.Ct. 2617, 49 L.Ed.2d 368 (1976), an action to enjoin enforcement of a California statute prohibiting the advertisement of prescription drugs, Chief Judge Peckham rejected a similar claim that he abstain from deciding the constitutional issue. He stated:

"The contribution of federal courts to the development of constitutional law would

be severely restricted by a doctrine that required deference to the state courts each time a case was presented in which both the state and federal courts had the jurisdiction and duty to examine the constitutionality of state legislation. Abstention is particularly inappropriate when the statutes are challenged on First Amendment grounds. *See Procunier v. Martinez,* 416 U.S. 396, 404, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); *Zwickler v. Koota,* 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). Accordingly, this court will proceed to the merits." *Id.* at 97.

Such considerations are, of course, equally relevant to the instant case.

The cases upon which the State relies are distinguishable. In *Bellotti v. Baird, supra,* the Court was faced with a newly-enacted, ambiguous statute governing the requirements of consent for minors seeking abortions. The Court made it clear that the precise interpretation placed on the statute would determine the outcome of the constitutional issues. *Id.* at 147–48, 96 S.Ct. 2857. No such ambiguity is present here.

The remaining cases cited by the State are relevant only to a separate branch of the abstention doctrine: namely, that the federal courts will avoid interference, where possible, with the judicial development of complex local regulatory schemes of vital state concern. *See Colorado River Water Conservation District v. United States, supra* (challenge to comprehensive state regulation of water rights); *Lake Carriers' Association v. MacMullan, supra* (challenge to Michigan Watercraft Pollution Act, regulating pollution of all state waters); *Sea Ranch Association v. California Coastal Zone Conservation Commission,* 396 F.Supp. 533 (N.D.Cal.1975) (challenge to the California Coastal Zone Conservation Act, regulating all development of state seashore lands). The Court does not understand defendants to argue, nor could they, that the instant case presents such a situation.

For these reasons, the Court finds the narrow doctrine of abstention not applicable in this case, and now proceeds to fulfill its duty to adjudicate the controversy properly before it: to wit, whether the statute prohibiting "the advertising of clinical laboratory procedures to the lay public in magazines, newspapers, * * * etc. * * *" violates the First Amendment.

### III.

 Relying upon recent Supreme Court decisions which have invalidated broad state prohibitions on advertising, plaintiff argues that the statute is unconstitutional, both on its face and as applied to the material sought to be published.[8] In adjudicating Free Speech claims, the Court's task is clear: it must balance the speaker's interest in the speech asserted against the importance of the rationales put forward to support the regulation. *See, e. g., Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 766, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). This is a two-step process, requiring the Court first to assess the free speech interests at stake, and then to weigh them against the public interests served by the regulation. *Bigelow v. Virginia,* 421 U.S. 809, 826, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). If the rationales offered to justify the suppression of speech cannot withstand close scrutiny, the statute must fall.

There can be little doubt that plaintiff's interest in its advertisements is significant. The Supreme Court has made it clear not only that the commercial character of a publication does not render it valueless in the eyes of the Constitution, *id.* at 818, 95 S.Ct. 2222, but also that even speech merely proposing a commercial transaction deserves *First Amendment protection. Virginia State Board of Pharmacy v. Virginia*

*Citizens' Consumer Council, Inc., supra,* 425 U.S. at 762, 96 S.Ct. 1817; *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), *rehearing denied,* 434 U.S. 881, 98 S.Ct. 242, 54 L.Ed.2d 164 (1977).

In addition, a review of plaintiff's advertisements suggests that they may hold value above and beyond their commercial aspects, since they contain "information of potential interest and value to a diverse audience." *Bigelow v. Virginia, supra,* 421 U.S. at 822, 95 S.Ct. at 2232. In *Bigelow,* the Supreme Court found heightened value in advertisements for abortion services, by virtue of the fact that consumers were informed that abortions were legal in New York without any requirement of residency. *Id.* at 822, 95 S.Ct. 2222. Much the same can be said of Metpath's advertising in light of growing concern over American health—particularly heart disease—and the urgent need to expand the reach and effectiveness of modern health care advances. Certainly, measures which have the effect of increasing public awareness of potential health problems and the means available for detecting their presence, appear to this Court to be well within the protection of the First Amendment.

Having determined that plaintiff's interest in publishing its messages is a significant one, the Court now turns to an assessment of the rationales for the challenged advertising ban. In essence, the State advances two: (1) that in light of the public's lack of "technical-professional expertise," and the often technical and complex nature of advertising by clinical laboratories, *any* advertisements will be "inherently misleading"; and (2) that the structure and content of the advertisements will have the practical effect of directly soliciting members of the public to have the tests performed. Neither of these arguments has sufficient merit to overcome plaintiff's strong First

---

8. There can be no argument that Metpath, as a corporation, is not entitled to the protection of the First Amendment for the publication of its advertisements. The Supreme Court declared last term that speech does not lose its constitu-

tional value merely because uttered by a corporation. *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978).

Amendment interest in its advertising activities.

The State's first contention bears close consideration. In both *Bates* and *Virginia Board,* Justice Blackmun, speaking for the Court, made clear that it was deciding the narrow issue of *price* advertising, suggesting that advertisements concerning the *quality* of services were likely to pose more difficult problems, due to the inherent dangers of manipulation and confusion therein. *Bates v. State Bar of Arizona, supra,* 433 U.S. at 366, 97 S.Ct. 2691; *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., supra,* 425 U.S. at 773, 96 S.Ct. 1817. And there is no doubt that plaintiff's advertisements address quality as well as price. *See* n.2, *supra.* However, the circumstances present in this case persuade the Court that the dangers to which the State refers cannot justify the broad sweep of its advertising ban.

First, as a matter of fact, it does not seem likely that *all* advertisements by clinical laboratories will be "inherently misleading." Metpath's self-interest in communicating effectively with the general public certainly militates against its use of confusing or technical language. In addition to Exhibit 3, which appears to present no technical material of any kind, the Court can imagine an infinite number of advertisements of equal simplicity which Metpath might choose to publish.

Second, the fact that the tests advertised must be prescribed by a physician serves to insulate the public from the effect of complex and possibly misleading advertisements. Since Metpath is forbidden to provide its services directly to the public, there appears to be no danger, as there was in *Bates* (where the lay public was the direct consumer of the services advertised) that unsophisticated readers could be duped by Metpath into purchasing harmful or useless tests. Should the gullible recipient of the advertising be misled into seeking a test which would be inappropriate for him or her, the need to obtain a physician's approval would likely serve as a prophylactic to serious harm.

In addition, the Supreme Court has considered and rejected a similar argument. In *Bates,* the Arizona Bar argued that lawyer advertising would be "inherently misleading" by confusing the client as to the nature of services to be rendered, and that it would not provide enough information to enable the consumer to select appropriate legal services. *Bates v. State Bar of Arizona, supra,* 433 U.S. at 372–75, 97 S.Ct. at 2704. The Court responded:

> "Although the client may not know the detail involved in performing the task, he no doubt is able to identify the service he desires at the level of generality to which advertising lends itself.
>
> [I]t seems peculiar to deny the consumer, on the ground that the information is incomplete, at least some of the relevant information needed to reach an informed decision. The alternative—the prohibition of advertising—serves only to restrict the information that flows to consumers. * * * In any event, we view as dubious any justification that is based on the benefits of public ignorance." *Id.* at 374–75, 97 S.Ct. at 2704.

The same can be said about the medical consumer, who is certainly intelligent enough to discern that blood tests may be a useful and desirable tool for ferreting out possible health problems.

Finally, once the Court determines that such advertising is not "inherently misleading," it is clear that the statute is impermissibly broad. In the First Amendment area, the State cannot use a shotgun to kill a fly. As the Supreme Court has many times stated:

> " 'Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.' *NAACP v. Button,* 371 U.S. 415, at 438 [83 S.Ct. 328, 9 L.Ed.2d 405]. If the State has open to it a less drastic way of satisfying its

legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties. *Shelton v. Tucker,* 364 U.S. 479, 488, [81 S.Ct. 247, 5 L.Ed.2d 231]". *Kusper v. Pontikes,* 414 U.S. 51, 59, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973).

Here,. the statutory language prohibiting "advertising which is false or misleading" constitutes a sufficient tool for achieving the goal of honest, accurate advertising. *Metpath, Inc. v. Imperato,* 450 F.Supp. 115, 120 (S.D.N.Y.1978). There can be no justification for precluding all advertising in order to protect the public from those items, however numerous, which may be deceptive.

The nature of the second interest advanced in support of the statute—the prevention of direct public solicitation by clinical laboratories—is ambiguous. It is unclear, for example, how direct solicitation can be effectuated in light of statutory prohibitions against the performance of clinical laboratory services for other than a physician.[9] And Metpath's advertisements contain the clear warning that "all laboratory tests must be ordered through your physician." With these facts in mind, it is difficult to distinguish this case from the decision in *Virginia Board, supra,* which permits pharmacists to advertise prescription drug prices directly to the public, despite the fact that sale of such drugs without a doctor's prescription remains unlawful.

Furthermore, even accepting defendants' premise that "at least a portion of their readers will have their interest/curiosity aroused to such an extent that those readers will request their physicians to authorize the tests," it is hard to see why this is undesirable. If the public is encouraged to seek professional help for real or perceived health problems, so much the better.[10] It is irrelevant, as the Supreme Court has pointed out, that Metpath's motives may be, as they surely are, commercial rather than altruistic. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., supra,* 425 U.S. at 761–62, 96 S.Ct. 1817.

Finally, as noted previously, there are less drastic alternatives by which the State can accomplish its objectives. The enforcement of existing statutes, *see* n.9, *supra,* prohibiting the direct provision of services to the public by clinical laboratories should be sufficient to mitigate the danger that certain consumers will take Metpath's advertising as a direct solicitation. The First Amendment requires that this more narrow, exacting approach be imposed on the State in order that the unhindered exchange of information, so important to our economic and political way of life, may flourish.

## IV.

No more precious rights safeguard the perpetuation of the Republic than those protected by the Free Speech Clause of the First Amendment. It is manifest that enforcement by the State of the statute barring the advertising of "clinical laboratory procedures to the lay public" would be a clear violation of Metpath's First Amendment rights.[11]

---

**9.** Section 1288 of the California Business and Professions Code (Deering) (1975) provides:

"Any person conducting or operating a clinical laboratory may accept assignments for tests only from and make reports only to persons licensed under the provisions of law relating to the healing arts or their representatives."

*See also* Cal.Bus. & Prof.Code § 1320(i) (Deering) (Supp.1978).

**10.** Defendants' argument is reminiscent of the proposition, advanced in *Bates,* that advertising by lawyers "[would] have the undesirable effect of stirring up litigation." *Bates v. State Bar of Arizona,* 433 U.S. 350, 375, 97 S.Ct. 2691, 2704. The Court's response was that "we cannot accept the notion that it is always better for a person to suffer a wrong silently than to redress it by legal action." *Id.* at 376, 97 S.Ct. at 2705. So too here.

**11.** The Court's conclusion that the challenged statute does not pass constitutional muster is supported by the recent decision in *Metpath, Inc. v. Imperato,* 450 F.Supp. 115 (S.D.N.Y.

Accordingly, the Court, in granting judgment for the plaintiff, declares unconstitutional that portion of Section 1320(h) of the California Business and Professions Code which prohibits "[the] advertising of clinical laboratory procedures to the lay public * * *" because it violates the First Amendment to the Constitution of the United States, and the State is permanently enjoined from its enforcement. Counsel for plaintiff will prepare, serve and lodge with the Court a form of judgment approved as to form by the State on or before November 15, 1978.

EXHIBIT 1

# Most People Think Eskimos Don't Know How to Live...

They supposedly get their kicks by rubbing noses, for example And there's something terribly fishy about their diet. However, what most people don't know is that Eskimos almost never die of heart disease. But, half a million black and white Americans do die of heart attacks each year — and about 30 million require treatment for some form of cardiovascular disease. We think there's something pretty fishy about that.

Medical researchers have taken a closer look at Eskimos One thing they discovered was that they have very high levels of a type of cholesterol known as HDL (High Density Lipoproteins) in their blood. So do a lot of other people who tend not to get heart disease — like young American women, vegetarians, and long-distance runners. HDL levels are highest in newborn babies — and decrease with age, especially in people who are physically inactive and eat high cholesterol diets.

The encouraging thing about HDL is that it apparently **protects** people against heart disease — and it **can be increased** by regular exercise like jogging, by eating chicken and fish, instead of meat, and by giving up things like potato chips that are high in saturated fats. People are raising their HDL levels that easily.

It's all possible because there's a simple medical laboratory test that measures HDL levels in your blood. It's a new test —performed by MetPath, a medical laboratory which serves physicians, hospitals, and industry nationwide.

We're doing a lot of HDL testing these days — for physicians whose patients want to check out their HDL levels and for people who are working to get their HDL levels up. We also perform hundreds of other tests that help physicians prevent, diagnose and treat disease — but we thought you should know about HDL. Because for once, a high level of something is good for you And for once, you can do something about it

We're MetPath We help your physician find out more about you. And even though all laboratory tests must be ordered through your physician, we thought you should know something about us.

**METPATH**

60 Commerce Way, Hackensack, N J 07606
201/488-1100

**Because every test is important.**

1978). There, in response to the same claims which Metpath presses here, the district court struck down a New York City Health Code provision nearly identical to the California statute attacked in this action. The regulation provided:

"A clinical laboratory shall not advertise for patronage to the general public by means of bills, posters, circulars, letters, newspapers, magazines, directories, radio, television, or through any medium." New York City Health Code § 13.21(h) (1973).

And while the Court respectfully disagrees that "the public interest allegedly served by this regulation causes no perceptible movement when placed in the scales opposite * * * the first amendment * * *," *Metpath, Inc. v. Imperato, supra,* 450 F.Supp. at 120, the Court does find that the rationales articulated by the State are insufficient to overcome the strong presumption in favor of plaintiff's right to advertise.

EXHIBIT 2

# Glycohemoglobin.
## Sweet News for Millions of Diabetics.

Glycohemoglobin is a fancy name for a new laboratory test that measures the amount of sugar (glucose) stored by the red blood cells. We've introduced it at MetPath, a nationwide laboratory service for physicians, hospitals and industry, because we recognized its importance to the five million American diabetics who face a lifetime of medication and expensive laboratory tests.

Physicians need to know their patients' daily glucose levels in order to prescribe the right amount of insulin and/or the proper diet for control of the disease. But until now, even with regular testing, it's been difficult to determine, with full confidence, the diabetic's daily glucose levels and the effect of the treatments prescribed.

Now, by measuring the amount of glucose stored by the red cells, a single Glycohemoglobin Test tells what the patient's average blood sugar level has been during the past two or three months—not just at the time of testing. With this more accurate estimate of the day-to-day level, the physician can prescribe more precise treatment for better control of the disease. Better control can help

reduce the risk of blindness, and the heart, kidney and nerve diseases that tend to develop in people with diabetes, long before they reach old age. And, because only one Glycohemoglobin Test every two months is necessary, the patient is spared the cost and inconvenience of more frequent blood testing.

We're MetPath. We help your physician find out more about you. And even though all laboratory tests must be ordered by a physician, we thought you should know something about us.

**METPATH**

60 Commerce Way, Hackensack, NJ 07606
201/288-0900

## Because every test is important.

EXHIBIT 3

# Medical labs don't kill rabbits.

A popular myth has it that when a pregnancy test is positive, a rabbit dies. Actually, some years back, live rabbits were used in pregnancy testing, But, today the equivalent of the 2-4 day rabbit test is performed in a test tube in just minutes, and with far greater certainty in the results.

We're MetPath. A clinical laboratory ... the place your physician sends blood, urine, throat swabs and pap smears for medical tests. We're working to explode some other popular myths.

**MYTH: Health Care Costs Must Inevitably Keep Rising.**
Over the last ten years we've actually been lowering the cost of many lab tests. For example, a group of 25 chemistry tests that would have cost about $200 in 1966 is provided today by MetPath for about $10.

**MYTH: You Always Have to Pay Much More for Quality.**
MetPath is a clinical laboratory dedicated to quality—one of the few that dares to publish the results of external proficiency testing*. Yet our tests generally cost no more, and usually cost less, than many other labs, large or small.

**MYTH: Unless You're Hospitalized, You Have to Wait Up to a Week for Lab Test Results.**
Some tests, like throat cultures for example, do require a few days—no matter where the test is done. But most blood tests can (and should) be performed overnight so your physician has the answers needed to start treatment. At MetPath, 24-hr. service is our standard policy. By utilizing radio-dispatched couriers, jet transportation and an extensive computer network, we are able to put most test results in your physician's hands the day after your specimen is taken—even if you're 3,000 miles from our central lab!

We're MetPath. We help your physician find out more about you. And even though all laboratory tests must be ordered by a physician, we thought you should know something about us.

*Clinical labs participating in interstate commerce and those seeking accreditation from professional medical societies are subjected to unannounced checking of their testing accuracy and precision by professional and governmental bodies.

One Malcolm Avenue
Teterboro, NJ 07608

**Because every test is important.**